John BUSH, et al.,
Plaintiffs-Appellants,

v.

Robert O. VITERNA, et al.,
Defendants-Appellees.

No. 85–1560.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1986.

Steven Ney, ACLU Nat. Prison Project, Elizabeth Alexander, Washington, D.C., James C. Harrington, Ed Sherman, Univ. of Texas School of Law, Austin, Tex., for plaintiffs-appellants.

F. Scott McCown, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for Viterna.

Steve Bickerstaff, Ann Clarke Snell, Austin, Tex., for amicus—Texas Ass'n of Counties.

Before GEE and HIGGINBOTHAM, Circuit Judges, and HARVEY,* Senior District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In 1975 the Texas legislature created the Texas Commission on Jail Standards and charged it to implement a policy "that all county jail facilities in the state conform to certain minimum standards of construction, maintenance, and operation." Tex.Rev.Civ. Stat.Ann. art. 5115.1 § 1 (Vernon Supp. 1986). The Commission was assigned to promulgate rules and standards and was given certain enforcement powers. A class of all current and future inmates in Texas' county jails sued under 42 U.S.C. § 1983, asking a federal district court to compel the Commission to discharge its state-imposed duties. The district court granted a motion to dismiss, rejecting the contention that the Commission's alleged breach of duties imposed upon it by state law could give rise to a constitutional wrong. We are persuaded that the effort by Texas to improve conditions at its 254 county jails is not subject to federal superintendence. Because the asserted claim is an illegitimate effort to seek federal enforcement of state law, we affirm the district court's dismissal of the action.

I

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), made it plain that the eleventh amendment bars enforcement in federal court of state-law claims against states. The plaintiff class does not contend otherwise. Conceding that the district court lacks the power to entertain a suit seeking enforcement of state law, the class asserts that the breach, by a state actor, of a state-imposed duty to correct constitutional wrongs is itself a constitutional wrong. Thus, while this class concededly had no claim against any agency with state-wide powers until Texas created the Commission in an effort to remedy deficien-

cies in its county jails, the undertaking to remedy is said to create liability for failures to carry out that undertaking. Termed a theory of "supervisory liability," the assertion is that the Commission is a legal cause of constitutional wrongs that it fails to prevent or correct. The class points to language in the Civil Rights Act of 1871, 42 U.S.C. § 1983, that provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, *or causes to be subjected,* any ... person within the jurisdiction [of the United States] to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured...." (emphasis added). Alluding, somewhat vaguely, to alleged violations of the eighth and fourteenth amendments, the class urges that its theory of supervisory liability has been adopted by this court in *Sims v. Adams*, 537 F.2d 829 (5th Cir.1976), *Miller v. Carson*, 563 F.2d 757 (5th Cir.1977), and *Howard v. Fortenberry*, 723 F.2d 1206 (5th Cir.), *vacated in part*, 728 F.2d 712 (5th Cir.1984).

The defendants deny that state law makes the Commission responsible for enforcing federal constitutional standards; that if the statute is unclear in this critical respect, we should abstain to allow the state courts to interpret the statute, thus perhaps avoiding the constitutional issue; and that this case is controlled by *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The Fifth Circuit precedent cited by the class is said to be either distinguishable or inapplicable in light of the Supreme Court's decision in *Pennhurst*.

II

When the Texas legislature created the Commission, the authority to supervise, direct, or control the actual daily operation of each county jail lay with the elected sheriff of the county, subject to a superintending role of the county commissioner's court, the basic legislative body in each Texas

* District Judge of the Eastern District of Michigan, sitting by designation.

county. Neither the statute nor its legislative history suggests an intent to oust the counties from their historic role.

The statute creating the Commission, Tex.Rev.Civ.Stat.Ann. art. 5115.1 (Vernon Supp.1986), empowers that entity to act in several ways. In doing so it distinguishes between grants to the Commission of discretionary authority to act and impositions of mandatory duties to act. For example, the law provides that the Commission *shall* establish minimum standards for the physical plant of county jails, for custodial care, and for staffing and services at those facilities. Tex.Rev.Civ.Stat.Ann. art. 5115.1 § 9(a)(1)–(3) (Vernon Supp.1986). Similarly, the Commission is obliged to require and review reports about the jails from county sheriffs and commissioners and to report any noncompliance with Commission standards or state law to those local officials and to the governor. *Id.* §§ 9(a)(8)–(9), 11(b). When the statute turns to enforcement, however, it gives the Commission broad powers without imposing any obligation to act. *See id.* § 11(d) ("If the [county] commissioners or sheriff does not comply [with commission orders] within the time granted by the commission, the commission *may*, by order, prohibit the confinement of prisoners in the noncomplying jail.") (emphasis added); *id.* § 11(f) ("The commission, in lieu of closing a county jail, *may* institute an action [in state court] in its own name to enforce, or enjoin the violation of, its orders, rules, or procedures, or of Article 5115 Revised Civil Stat-

utes of Texas, 1925, as amended.") (emphasis added).[1]

It appears from this statutory scheme that while the legislature imposed upon the Commission a duty to promulgate standards and investigate compliance, it did not impose a legal obligation to enforce those, or any other, standards. It follows that the asserted causal relationship between the Commission's breach of a state-imposed duty and any constitutional inadequacy of a particular county jail must rest upon the absence of announced regulation. Assuming, for now, both that the Commission has breached its statutory duties and that some county jails are constitutionally inadequate, the claimed causation is problematic. The counties were obliged to maintain their jails in conformity with constitutional standards before the Commission was created. It is unclear how any failure of the Commission to announce its own standards either causes or fails to halt any violations by the counties of the United States Constitution. The class asserts that the Commission has no discretion to promulgate and enforce standards that fail to protect inmates' constitutional rights. We can assume that the Commission lacked the discretion to set constitutionally inadequate standards in a way that would purport to authorize constitutional violations; and, as we read the statute, the Commission was indeed duty bound by state law to announce some regulations.[2] But these as-

1. It is conceivable that a state court could interpret the statute to require the Commission to exercise one of these two alternative enforcement powers. *Cf. Bush v. Viterna,* 740 F.2d 350, 353 n. 6 (5th Cir.1984) (dictum). Because the interpretive inference is hardly a necessary one, and because it would carry with it a major alteration in the historic relationship between the State of Texas and her counties, we think that this interpretation is far-fetched; if such a meaning is to be imposed on the statute, it should be done by the Texas courts, rather than by us. In any case, even if the statute were interpreted to impose on the Commission a duty to enforce state law, the statute gives no hint of any intent to require the Commission to enforce federal constitutional standards. If there were real ambiguity about the statute's intent, a strong argument could be made for abstention

under the doctrine of *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and its progeny. We think, however, that the meaning of the statute is sufficiently clear that we ought to decide the federal questions that depend on its interpretation.

2. Jail standards were initially adopted by the Commission pursuant to section 13(a) of article 5115.1, which required the Commission to promulgate standards on or before January 1, 1977. The current set of jail standards consists of over 600 regulations, which cover a broad range of subjects, from new jail construction and inmate housing to medical services, discipline, and grievances. *Bush v. Viterna,* 740 F.2d 350, 353 n. 3 (5th Cir.1984).

sumptions are not enough to sustain the position of the class in this case. By its own theory of supervisory liability, a causal nexus must be found between the alleged breach of duty, *viz.* failure to promulgate or inadequate promulgation of standards and regulations, and the asserted constitutional violations. With the statutory structure in hand, we turn to a closer examination of the proffered theory of "supervisory liability."

### III

#### A

■ We start by stating what supervisory liability cannot be: a mask for respondeat superior. The Commission cannot be vicariously liable for the acts of county officials in the maintenance of their jails—such attribution of liability is not permitted by § 1983, which imposes liability for constitutional wrongs exclusively upon persons who have participated in the wrongful acts. *Monell v. Department of Social Services*, 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978). To be sure, such participation can consist in formulating a policy pursuant to which subordinates deprive a person of his constitutional rights. Imposition of liability upon such policy makers bears a superficial resemblance to vicarious liability in that it visits persons who were superiors of the primary actors, but its real nature is quite different. The wrong is the policy itself—thus, given a causal nexus between the policy and the injury, liability is direct rather than attributed.

Without quarreling with any of this, the class takes the argument one step further. It asserts that a state official's failure to carry out his state-imposed duties can be a basis for a constitutional claim if there is a causal nexus between the failure to act and the constitutional wrong. The liability of the jailer who "fails to correct" a constitutionally inadequate jail is said to be an example. The jailer's duty to operate the jail is found in state law, and he is liable under § 1983 for resulting deprivations of constitutional rights. This example, which correctly illustrates one principle of federal constitutional law, can be misleading if used carelessly for purposes of analogy. In the example, state law identifies the jailer as the person responsible for the prisoners. The class appears to acknowledge as much by asserting that the role of state law in its supervisory theory is to identify the relevant state actors. Texas law, however, identifies the county sheriffs and commissioners courts, not the Commission on Jail Standards, as the keepers of the jails. Tex.Rev.Civ.Stat.Ann. arts. 5115, 5116 (Vernon Supp.1986). Of course the state legislature *could,* so far as we know, have made this Commission the keeper of the jails. But because it has not done so, the class is driven to seek responsibility for constitutional violations in the Commission's alleged failure to play the *remedial* role created for it by the legislature. As will be seen, we have not yet read the causation language of § 1983 broadly enough to allow this. Basic respect for the sovereignty of the states, along with the potentially intrusive consequences of the class' proposal, counsel strongly against our doing so now.

#### B

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Court rejected an argument similar to the one urged by the class in this case:

The theory of liability underlying the District Court's opinion ... is that even without a showing of direct responsibility for the actions of a small percentage of the police force, *failure* [by the petitioners: the Mayor, the City Managing Director, and the Police Commissioner] to act in the face of a statistical pattern [of police misconduct] is indistinguishable from the active conduct enjoined in *Hague* [*v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) ] and [*Allee v.*] *Medrano,* [416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) ]. Respondents posit a constitutional "duty" on the part of petitioners (and a corresponding "right" of the citizens of Philadelphia) to "elimi-

nate" future police misconduct; a "default" of that affirmative duty being shown by the statistical pattern, the district Court is empowered to act in petitioners' stead and take whatever preventive measures are necessary, within its discretion, to secure the "right" at issue. Such reasoning, however, blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words Congress chose in § 1983. We have never subscribed to these amorphous propositions, and we decline to do so now.

423 U.S. at 375–76, 96 S.Ct. at 606 (emphasis in original). The *Rizzo* Court distinguished *Hague*, explaining that in that case, "the pattern of police misconduct upon which liability and injunctive relief were grounded was the adoption and enforcement of deliberate policies ... [that] were implemented 'by force and violence' on the part of individual policemen." *Id.* at 374, 96 S.Ct. at 605. It was those policies that were enjoined. The dissenting Justices in *Rizzo* read the majority as rejecting the proposition that a state official "may be enjoined from consciously permitting his subordinates, in the course of their duties, to violate the constitutional rights of persons with whom they deal." *Id.* at 385, 96 S.Ct. at 611 (Blackmun, J., dissenting). Whatever the accuracy of the dissent's concerns, they were addressed to a more narrowly stated concept of supervisory liability than the class would have us adopt. Under the legislation creating the Commission on Jail Standards, the counties are not even subordinate to it in the same sense as individual policemen were to the *Rizzo* petitioners: unlike the police officials in *Rizzo*, the Commission apparently has *no* legal duty to correct deviations from any applicable standards.

The cases of this circuit are not to the contrary. In *Miller v. Carson*, 563 F.2d 757 (5th Cir.1977), this court reviewed a

decision of a district court that, in addition to other relief, ordered the Secretary of Florida's Department of Offender Rehabilitation to "adopt rules and regulations prescribing standards for the operation of detention facilities" as required by a Florida statute. The state statute " 'authorized and directed' Wainwright [a state official] to make *and enforce* rules for jails throughout the state." *Id.* at 760 (emphasis added). Wainwright argued on appeal that the claims were based solely on state law. The panel rejected his contention, concluding that the claims related to both federal and state law. Unlike the Texas Commission, however, Wainwright shared responsibility under Florida law for the operation of the jail, and the panel held that his partial responsibility was sufficient to expose him to liability under § 1983: "The fact that Wainwright shares responsibility for the operation of the jail with county officials does not relieve him of liability...." *Id.* at 760.[3] Thus *Miller v. Carson* is not directly instructive on the theory of supervisory liability urged by the class in this case.

*Miller v. Carson*, moreover, came before *Pennhurst's* rejection of pendent jurisdiction over state law claims against states. *Miller* relied, as did cases it cited such as *Taylor v. Sterrett*, 499 F.2d 367 (5th Cir. 1974), *cert. denied*, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975), upon the traditional efficiency concerns of pendent jurisdiction. Not surprisingly, the distinction between violations of state laws and violations of the federal Constitution were blurred. Thus, the panel reasoned: "Once federal constitutional violations were established, as they were here, the basic question in the federal claim was the extent of Wainwright's duty under federal law; in the state claim, his duty under the Florida statute. These two questions are similar.... [and] a parallel state court trial [would] have been duplicative...." 563

---

**3.** The panel, which acknowledged that "the violation of state law by a state official, without more, is not a violation of the federal right to procedural due process" went on to indicate that "when a state official's violation of state

law *causes* the imposition of cruel and unusual punishment, a federal cause of action arises under § 1983." 563 F.2d at 760 n. 7 (citations omitted) (emphasis added).

F.2d at 761. There are thus two reasons not to regard *Miller v. Carson* as controlling our decision: first, the Florida statute, unlike the Texas statute at issue here, mandated state enforcement of state regulations in a way that created a responsibility, shared by state and county officials, for *operation* of the jail; second, *Miller's* precedential force is weakened by its reliance upon principles of pendent jurisdiction and readings of the eleventh amendment that are no longer applicable.

The class urges that in any event we subscribed to its theory in *Howard v. Fortenberry,* 723 F.2d 1206 (5th Cir.), *vacated in part,* 728 F.2d 712 (5th Cir.1984), a § 1983 suit against numerous Louisiana prison officials that arose when two prisoners died of heat stroke when left in a disciplinary "hot box." The district court had dismissed the claims against some of the state officials and entered summary judgment in favor of others. Noting that "[t]he federal constitution does not of its own force impose a duty on any particular state official to supervise local jails," *id.* at 1213 (footnote omitted), the panel turned to the complex task of finding the particular officials whom state law would identify as the persons responsible for maintaining the "hot box." In the portion of the opinion most favorable to the present class, the panel reversed and remanded the summary judgment granted in favor of certain "sanitarians," who were officials charged under Louisiana law to make inspections of state prisons. The district court was instructed on remand to determine whether the sanitarians had a duty under state law to inspect the prison's isolation cells and, if so, whether that duty had been breached. *Id.* at 1216. The panel stated that the breach of such a duty could result in liability under § 1983, *id.* at 1215, and stressed that the sanitarians themselves appeared to believe that they would have had a duty to forbid the use of such a "hot box" had they discovered it, *id.* at 1213. The real question, therefore, was whether there had been constitutionally culpable negligence within the meaning of *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled, Daniels v. Williams,* ── U.S. ──, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The Texas Commission, by contrast, simply does not appear to have any state-imposed legal duty to correct jail violations or noncompliance that it becomes aware of. *Howard v. Fortenberry* is therefore inapposite.[4]

 In sum, accepting for now the concept that the breach of a state-imposed duty can cause a constitutional tort, we hold that the necessary causal relationship is absent when a state duty to regulate, monitor, inspect, or advise is not accompanied by an obligation to extirpate constitutionally substandard conditions or activities that may be encountered. We find the same distinction in other previous decisions. *See, e.g., Sims v. Adams,* 537 F.2d 829, 832 (5th Cir.1976) (finding that a police supervisor had a duty to "control a [particular] policeman's known propensity for improper use of force"); *Roberts v. Williams,* 456 F.2d 819, 830–33 (5th Cir.) (finding no legal duty to issue regulations that might have prevented an injury to an inmate accidentally shot by a prison trusty), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971).

## IV

### A

The defects in the theory of supervisory liability proposed by the class illustrate the importance of distinguishing the different roles that state and federal law inevitably play in the analysis of constitutional torts. 42 U.S.C. § 1983 creates a cause of action against any person who, under color of state law, causes another to be deprived of a federal right. As we recently emphasized in *Stern v. Tarrant County Hospital*

---

**4.** We also note that in *Howard v. Fortenberry,* as in *Miller v. Carson,* the relation between state-law duties and federal constitutional duties was somewhat blurred by the presence of pendent state claims. Although *Pennhurst* had been decided a few days before *Howard v. Fortenberry,* it was not cited, and the panel did not appear to be aware of it.

*District,* 778 F.2d 1052, 1056–60 (5th Cir. 1985) (en banc), *cert. denied,* —— U.S. ——, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986), the enforcement of state law is the job of the states, and the federal civil rights statute may not be used to bootstrap alleged violations of state law into federal claims.

Thus, whenever a cause of action is alleged under § 1983, the first question must be whether a federally secured right has been affected. In some cases, especially those involving an alleged deprivation of property without due process of law, it may be necessary to look to state law to determine such threshold questions as whether the claimant in fact had a property right in whatever it was that was taken away from him. *See, e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Shelton v. City of College Station,* 780 F.2d 475, 482 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). In such cases, it nonetheless remains true that a federal cause of action exists only for the deprivation of a federally protected right, for example to due process of law, and that such rights are defined exclusively by federal standards. *Loudermill,* 105 S.Ct. at 1492–93. The second question that must be asked is whether the alleged deprivation of a federal right has been accomplished by state action. Here again, it will obviously be necessary to consult state law in order to decide whether the deprivation occurred "under color of any statute, ordinance, regulation, custom, or usage" of the state. 42 U.S.C. § 1983. As the drafters' reference to "custom or usage" suggests, however, the definition of state action is ultimately a question of federal law: a state cannot insulate its constitutional torts from federal review by the simple expedient of authorizing them in a covert manner. After one has found a deprivation of a federally secured right and has determined that it resulted from state action, one must ask a third question: Who is the state actor responsible for the violation? Unlike the first two questions, this will usually be answered exclusively by reference to state law

and practice. Most violations of § 1983 occur as incidents of the exercise of perfectly legitimate state powers, such as deploying police forces, operating prisons, and acting as an employer in carrying out the manifold tasks of modern government. The states have virtually complete freedom to decide who will be responsible for such tasks, and therewith to determine who will be held liable for civil rights violations that occur in the course of carrying them out.

It is immediately apparent that a theory of supervisory liability is infected with a risk of applying state law rather than simply using state law to identify the persons responsible for an identified civil rights violation. In *Miller v. Carson* and *Howard v. Fortenberry,* for example, where the constitutional violations at issue were clear and definite, this court still had some difficulty in isolating the appropriate inquiry into the identity of the state actors responsible for the violations from the separate question of whether particular defendants had breached some duty imposed on them by state law. As the constitutional wrong at issue becomes less defined and specific, the risk of confusion is bound to become more pronounced. That risk can be reduced by using care in applying the three-step analysis summarized above—that is, by insisting that the federal right at issue and its violation through state action are both made clear before proceeding to ask which state actor is responsible for causing the wrong.

### B

The class in this case does not propose to prove that the conditions in each of the 254 Texas county jails deny the inmates their constitutional rights. There is no assertion that such deprivations exist in every county or that wrongs suffered in one are necessarily suffered in another. We recognize the attractiveness to the class of combining all litigation over county jails in one case before one federal judge. The goal is clearly to obtain a single comprehensive federal order requiring the Commission to ensure that federal constitutional stan-

dards are being met throughout the state. One result might be to improve living conditions at some of the county jails, but another result would be to impose enforcement duties on the Commission that the state's legislature withheld. This would be wrong in principle and onerous in practice. To take but one example: should the Commission lack the necessary money, as it doubtlessly would,[5] the class suggests that the ancillary power of the federal decree could be used to compel the state legislature to appropriate the required funds. The spectacle of forcing a state legislature to tax the people in order to correct constitutional violations that have not been identified, let alone proved, would be a vivid reminder of the pernicious real-world effects that can arise from seemingly innocuous doctrinal confusions. If the Commission on Jail Standards is not doing enough to carry out the state's policy of reforming its county jails, the remedy must be sought in one of the three branches of the government of Texas. If any of the county jails are operating in violation of federal law, the remedy can be sought in a federal suit against the officials whom the state has designated to operate those facilities. Section 1983, however, cannot be used as a lash for whipping state governments into faster action on reform programs that, however desirable, are not required by federal law. Neither this nor any other federal court is authorized to step outside the limits of article III and enlist itself in such well-meaning assaults on the states and their people.

AFFIRMED.