**REVISED**

United States Court of Appeals,

Fifth Circuit.

No. 96-50564.

Margarita LIGHTBOURN;  Burns Taylor;  Olivia Schonberger;  Grant
Downey;   Ann  Lemke;    Disabled  Ability  Resource  Environment,
Plaintiffs-Appellees,

v.

 The COUNTY OF EL PASO, TEXAS;  The Republican Party of El Paso
County;  The Democratic Party of El Paso County, Texas;  Antonio O.
Garza, Jr., Secretary of State of Texas, Defendants,

  Antonio O. Garza, Jr., Secretary of State of Texas, Defendant-
Appellant.

Aug. 1, 1997.

Appeal from the United States District Court for the Western
District of Texas.

Before JOLLY, DUHÉ and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Antonio O. Garza, Jr., the Secretary of State of Texas,
appeals the district court's order finding him in violation of the
Rehabilitation Act of 1973 and the Americans with Disabilities Act,
and requiring him to undertake certain remedial actions.  We
reverse and render judgment for the Secretary.

I

The plaintiffs are five blind residents of El Paso, Texas, one
mobility-impaired El Paso resident, and a private nonprofit group
that aids disabled persons.  They sued El Paso County ("El Paso")
and the local Republican and Democratic parties under § 504 of the

1

Rehabilitation Act of 1973, 29 U.S.C. § 794 (" § 504"), and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134. Subsequently, El Paso impleaded the Secretary, and the plaintiffs also added him as a defendant.

The plaintiffs alleged that the defendants discriminated against them by failing to ensure that persons with visual and mobility impairments have access to "polling sites and voting procedures." Specifically, the blind plaintiffs asserted that the voting equipment available at their polling places only permitted them to vote with the assistance of an election worker or other person, and the defendants had not taken steps to ensure that they could vote with complete secrecy.[1] Thus, they contended, the defendants violated § 504 and the ADA. In addition, the wheelchair-bound plaintiff maintained that she had trouble locating a parking space next to and using the restroom facilities at her polling place. She asserted that the defendants breached their obligation to ensure that polling places are accessible to handicapped voters and hence violated § 504 and the ADA.

The district court granted the plaintiffs' motion for class certification of all Texas citizens of voting age who are blind or severely mobility-impaired. The district court then granted the local Republican Party's motion to dismiss and denied the Secretary's motion for summary judgment. The plaintiffs settled

---

[1]Texas Election Code § 64.031 provides that a "voter is eligible to receive assistance in marking the ballot ... if the voter cannot prepare the ballot because of a physical disability that renders the voter unable to write or see...."

2

their claims against El Paso and the local Democratic Party, leaving the Secretary as the sole defendant in this lawsuit.[2]

After a bench trial, the district court made several findings in a written opinion. The court initially observed that Texas law provides a right to a secret ballot for all voters. The court found that the burdens the state alleged it would suffer if compelled to ensure blind voters a completely secret ballot were "speculative." To the contrary, the district court concluded that the Secretary could accommodate blind (as well as mobility-impaired) voters without affecting the voting methods of nondisabled persons. The district court also determined that the Secretary was a "public entity" subject to § 504 and the ADA, and that he is responsible for ensuring "uniformity in the various voting systems in use throughout the state." The district court ultimately concluded that "[t]he system of voting in the State of Texas" violates the ADA.[3]

After the subsequent remedies phase of the trial, the district court issued supplemental findings of fact and conclusions of law, and crafted a remedy for the § 504 and ADA violations it

---

[2]The plaintiffs aver that as part of their settlement with El Paso County, the county tested and used a template/tape recording system in its general elections in November 1996 which enabled blind voters to vote in secrecy. It is unclear whether the Secretary approved this voting system. *See* Tex. Elec.Code § 122.031 ("Before a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state....").

[3]The district court's opinion does not specify whether it found that "[t]he system of voting in the State of Texas" also violates § 504.

3

discovered. The court found both that the Secretary has a duty to ensure that local election authorities comply with the ADA, and that "[t]he Secretary has joint responsibility with the state's local election authorities in assuring compliance with the ADA and Section 504 in conducting elections." The court also determined that the Secretary had failed to take several possible actions to remedy discrimination against blind or mobility-impaired voters, such as encouraging the development of voting systems that enable blind voters to vote with complete secrecy. The court found that statutory methods of assisting blind persons to vote both abridge the right to a secret ballot and cause "embarrassment and sometimes humiliation." With respect to mobility-impaired voters, the court determined that the evidence before it indicated "widespread non-compliance throughout Texas" with the physical accessibility requirements of § 504 and the ADA. Finally, the court concluded that modification of "the current policies, practices, and procedures that result in the denial of the secrecy of the ballot for blind voters would not cause a fundamental alteration in the nature of the State's voting program."

The district court ordered extensive and detailed remedial measures to effect its "intention to have an ADA-compliant voting system in place for the next national election in the year 2000." The court emphasized that "only those matters over which the Secretary has direct control are addressed [in the remedial order]." First, the district court ordered that after December 1, 1996, the Secretary approve only voting systems that comply with

the ADA and that enable blind voters to vote in total secrecy. Second, the court ordered the Secretary to issue directives, guidelines and instructions based on of the ADA and its implementing regulations and distribute them to local election authorities within eighteen months of the court's order. The directives, guidelines and instructions must state that: (1) voting systems purchased after December 31, 1997 must be accessible to blind and mobility-impaired voters and ensure a secret ballot for blind voters; (2) by December 31, 1998, current voting systems must be modified to be accessible to blind and mobility-impaired voters and ensure a secret ballot for blind voters; and (3) by December 31, 1999, all voting systems must be modified to be accessible to blind and mobility-impaired voters and ensure a secret ballot for blind voters. The district court ordered the Secretary to submit the directives, guidelines and instructions to it for review. The court further instructed the Secretary to "devise a system of systematically monitoring" § 504 and ADA compliance by local election authorities and to compile a detailed report regarding compliance to be "delivered, on the anniversary date of this Judgment, to the Court throughout the duration of this Judgment." Last, the district court directed that it would retain jurisdiction over the judgment for enforcement purposes. The Secretary appeals.

## II

The Secretary presents three arguments on appeal. First, he contends that the district court improperly certified the

5

plaintiffs to represent all Texas citizens of voting age who are blind and severely mobility-impaired. Second, he argues that the plaintiffs cannot state a claim against him under § 504. Third, he asserts that the district court erred in holding that he violated the ADA by breaching a duty to ensure that local election authorities comply with the ADA. We address each argument in turn.

A

The Secretary initially contends that the district court improperly certified the plaintiffs to represent all Texas citizens of voting age who are blind or mobility-impaired. He maintains that class certification was improper because none of the plaintiffs has voted outside of El Paso since enactment of the ADA, the plaintiffs have settled their claims against El Paso, and the punch-card voting system used in El Paso differs from the paper-ballot voting system used in many Texas counties.

The district court did not make any specific findings of fact with respect to the plaintiffs' class certification motion. The district court did, however, specifically find that the plaintiffs met the prerequisites of Federal Rule of Civil Procedure 23(a) and (b)(1) and (2).[4] The district court has wide discretion in

_____

[4]Rule 23 provides in relevant part:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

deciding whether to certify a proposed class. *McGrew v. Texas Bd. of Pardons & Paroles,* 47 F.3d 158, 162 (5th Cir.1995). Assuming that the court considered the Rule 23 criteria, we may reverse its decision only for abuse of discretion. *Id.*

The Secretary does not dispute the numerosity and adequacy of representation elements of Rule 23(a). In addition, Rule 23(b)(2) clearly applies to this case because the Secretary has "acted or refused to act" on grounds generally applicable to the class. Hence, we need only address whether the plaintiffs satisfy the commonality and typicality elements of Rule 23(a).

The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of

---

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;  or
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

Fed.R.Civ.P. 23.

the putative class members. *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993). Several such issues exist in this case, including whether the Secretary violated § 504 or the ADA by failing to direct local election officials to enforce these statutes. Furthermore, allegations of similar discriminatory practices generally meet the commonality requirement. *Shipes v. Trinity Indus.,* 987 F.2d 311, 316 (5th Cir.1993). The plaintiffs here allege that the Secretary similarly discriminated against all class members by failing to direct local election officials to comply with § 504 and the ADA. Thus, the plaintiffs satisfy the commonality requirement for class certification.

The test for typicality, like the test for commonality, is not demanding. *Forbush,* 994 F.2d at 1106. Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent. *Flanagan v. Ahearn (In re Asbestos Litig.),* 90 F.3d 963, 976 (5th Cir.1996). In the event the class members in this case were to proceed in a parallel action, they would advance legal and remedial theories similar, if not identical, to those advanced by the named plaintiffs. Thus, the plaintiffs also satisfy the typicality requirement for class certification. Accordingly, we determine that the district court did not abuse its discretion in granting the plaintiffs' motion for class certification.

B

The Secretary next argues that the plaintiffs cannot state a

8

claim against him under § 504 of the Rehabilitation Act of 1973 because he does not receive financial assistance from the federal government. In determining that the Secretary violated § 504, the district court made no finding regarding the Secretary's receipt of federal financial assistance. The plaintiffs maintain that the general receipt of federal funds by the State of Texas brings the Secretary within § 504.

We review the district court's conclusions of law *de novo, Chandler v. City of Dallas,* 958 F.2d 85, 89 (5th Cir.1992), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994), and its factual findings for clear error. *Henderson v. Norfolk S. Corp.,* 55 F.3d 1066, 1068 (5th Cir.1995).

The Rehabilitation Act provides that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving *Federal financial assistance* ...." 29 U.S.C. § 794(a) (emphasis added). Section 794(b) defines "program or activity" as:

all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

...

9

> (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3);

any part of which is extended Federal financial assistance. The parties do not contest that the State of Texas receives federal aid. The Secretary, however, asserts that the state's receipt of federal funds does not suffice to bring him within § 504 in the absence of evidence of receipt of such funds by the Secretary. In response, the plaintiffs maintain that the Secretary "stipulated" in district court that he is subject to § 504 and thus is precluded from arguing that the plaintiffs failed to state a claim against him under that section. We agree with the Secretary.

First, a defendant's stipulation that he is subject to a claim is controlling only if the plaintiff has first alleged the facts that establish that claim. A defendant cannot stipulate to a claim that is defective as a matter of law. *See United States v. John J. Felin & Co.,* 334 U.S. 624, 640, 68 S.Ct. 1238, 1246, 92 L.Ed. 1614 (1948) (stating that court will disregard parties' stipulation as to "facts," even if accepted and applied by court below, "if the stipulation obviously forecloses real questions of law"). Second, even if the plaintiffs *had* asserted that the Secretary received federal financial assistance, they still cannot show that he stipulated to this point. Indeed, Warren Thomas Harrison, Deputy Assistant Secretary of State of Texas for Elections, testified on cross-examination that the Secretary "never receive[s] federal money," and that the Secretary "get[s] no federal money." In addition, in his closing argument at the liability phase of the trial, the Secretary averred that the

10

plaintiffs have no cause of action under § 504 because "the Secretary of State doesn't receive any federal money."

We have held that to state a § 504 claim a plaintiff must allege that the specific program or activity with which he or she was involved receives or directly benefits from federal financial assistance. *Brown v. Sibley,* 650 F.2d 760, 767-71 (5th Cir. Unit A 1981). Certainly, a plaintiff may not predicate a § 504 claim against a state actor on the mere fact that the state itself obtains federal money. *See id.* at 767 ("The State of Mississippi, for example, receives "federal financial assistance,' in the generic sense of those words, but no one would contend that section 504 therefore reaches all proprietary and governmental activities of the State of Mississippi."). Here, the plaintiffs have not even argued that the Secretary receives federal financial assistance—let alone presented any evidence on this point. Therefore, the plaintiffs have failed to state a claim under § 504 against the Secretary.

C

Last, the Secretary argues that the district court erred in holding that he violated the ADA by breaching a duty to ensure that local election authorities comply with the ADA. As noted above, we review the district court's conclusions of law *de novo, Chandler,* 958 F.2d at 89, and the district court's factual findings for clear error. *Henderson,* 55 F.3d at 1068.

Based on scattered provisions of the Texas Election Code, the district court found that the Secretary had a duty to warrant that

11

local election authorities followed the ADA. Relying on Texas Election Code §§ 31.003[5] and 31.005,[6] for example, the district court concluded that the Secretary is responsible for ensuring ADA compliance throughout state elections because the Secretary is "the person who[m] all political subdivisions in Texas call for advice and the person who bears the responsibility for uniformity in the various voting systems in use throughout the state."  The district court interpreted § 31.005 as charging the Secretary with protection of voting rights in Texas and found the Secretary responsible for inspecting and validating proposed voting systems.

---

[5]Section 31.003 provides:

> The secretary of state shall obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code.  In performing this duty, the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on this code and the election laws outside this code.  The secretary shall distribute these materials to the appropriate state and local authorities having duties in the administration of these laws.

[6]Section 31.005 states:

> (a) The secretary of state may take appropriate action to protect the voting rights of citizens of this state from abuse by the authorities administering the state's electoral processes.

> (b) If the secretary determines that a person performing official functions in the administration of any part of the electoral process is exercising the powers vested in that person in a manner that impedes the free exercise of a citizen's voting rights, the secretary may order the person to correct the offending conduct.  If the person fails to comply, the secretary may seek enforcement of the order by temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

12

In sum, the district court determined that "[t]he Secretary does not afford blind voters and/or mobility impaired voters an equal opportunity to participate in, or benefit from, the State's voting program that is equal to that accorded voters who are not disabled."

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, to establish a violation of Title II, the plaintiffs here must demonstrate: (1) that they are qualified individuals within the meaning of the Act; (2) that they are being excluded from participation in, or being denied benefits of, services, programs, or activities for which the Secretary is responsible, or are otherwise being discriminated against by the Secretary; and (3) that such exclusion, denial of benefits, or discrimination is by reason of their disability. The Secretary does not dispute that the plaintiffs are qualified individuals within the meaning of the ADA or that he is a public entity for purposes of the statute. The Secretary, however, asserts that he has not denied the plaintiffs the benefit of a program for which he is responsible.

In *Bush v. Viterna,* 795 F.2d 1203 (5th Cir.1986), a class of prisoners sued the Texas Commission on Jail Standards under 42 U.S.C. § 1983, based upon county jail conditions that allegedly violated the Constitution. The plaintiffs claimed, under a theory

13

of "supervisory liability," that the Commission's failure to discharge its state law-imposed duties caused the constitutional violations. The plaintiffs argued that if the Commission had followed its state law obligations to promulgate regulatory standards and enforce those standards, local officials would have ensured that conditions and activities in county jails did not violate the Constitution.

We analyzed the Commission's state law duties, and found that the Commission's purpose was to remedy inadequacies in county jail conditions. We also concluded that the Commission was required to promulgate standards, but was merely authorized to enforce those standards by order or by filing suit against noncomplying counties. *Id.* at 1205. We observed that when a federal right is deprived through state action, the court must turn to state law to determine which state actor is legally responsible for the violation. "States have virtually complete freedom to decide who will be responsible for such tasks, and therewith to determine who will be held liable for civil rights violations that occur in the course of carrying them out." *Id.* at 1209. We found that the Commission "simply does not appear to have any state-imposed legal duty to correct jail violations or noncompliance that it becomes aware of." *Id.* at 1208. Thus, we found that the prisoners did not state a claim against the Commission under § 1983.

The plaintiffs' claim in *Bush* is analogous to the plaintiffs' claim here that the Secretary has a duty to ensure compliance with the ADA with regard to Texas elections. Following *Bush,* we look to

14

Texas law to determine whether responsibility for the violations the plaintiffs allege can properly be attributed to the Secretary.[7]

Review of the provisions of the Texas Election Code that refer to the Secretary's role in elections reveals that most give discretion to the Secretary to take some action. *See, e.g.,* § 31.005(a) (stating that the Secretary "*may* take appropriate action to protect the voting rights of the citizens ... from abuse ..."); § 122.001(c) (noting that the Secretary "*may* prescribe additional standards for voting systems ..."); § 122.002 (providing that the Secretary "*may* inspect at any time ... a voting system ..."); § 122.003(a) (stating that the Secretary "*may* prohibit the use" of a voting system that does not comply with applicable standards). Provisions merely authorizing the Secretary to take some action do not confer a legal duty on him to take the contemplated action. *See Nalle v. Taco Bell Corp.,* 914 S.W.2d 685, 687 (Tex.App.1996, writ denied) ("The word "may' means possibility, permission, liberty, or power; it does not indicate a mandatory requirement."). In the absence of such a duty, the Secretary cannot be held responsible for a failure to exercise his

_____

[7]During the bench trial, the district court received extensive evidence regarding the decentralized nature of the Texas election system. Specifically, although the Texas Election Code designates the Secretary the chief elections official in Texas, the Secretary does not conduct elections. Rather, the state's 3,000 or so political subdivisions run general and special elections, while the political parties conduct primary elections. In addition, the Secretary does not pick polling sites for elections. Instead, counties and political subdivisions select the location of polling places for general and special elections; county chairs of political parties pick polling sites for primary elections. The Secretary's approval is required only if a local party seeks to use a site other than an available county-designated polling place.

15

discretion.

The Texas Election Code does contain some provisions requiring the Secretary to take action with respect to elections. Specifically, § 31.003 states that the Secretary

> shall obtain and maintain uniformity in the application, operation, and interpretation of [the Texas Election Code] and of the election laws outside this code. In performing this duty, the secretary shall prepare detailed and comprehensive written directives and instructions relating to and based on [the Texas Election Code] and the election laws outside this code. The secretary shall distribute these materials to the appropriate state and local authorities having duties in the administration of these laws.

Moreover, § 31.004 provides that the Secretary

> (a) ... shall assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code.

> (b) The secretary shall maintain an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties.

Whether these sections impose a duty on the Secretary to ensure compliance with the ADA throughout Texas turns on whether the phrase "election laws outside this code" includes the ADA.

The Texas Code does not define "election laws," and we have found no case construing this phrase.[8] Thus, we first look to the

---

[8]In *United States v. State of Texas,* 422 F.Supp. 917, 921 (S.D.Tex.1976), *dismissed,* 430 F.Supp. 920 (1977), a three-judge court held that the United States stated a cause of action against the Secretary for allegedly "permitt[ing] local election officials ... to apply different and more stringent voter registration standards" to certain black students in violation of the Constitution and certain federal voting provisions. In so holding, the court relied on a predecessor statute to § 31.003 which required the Secretary "to obtain and maintain uniformity in the application, operation and interpretation of the election laws."

A few months later, though, the court decided that, under

16

ordinary, contemporary, common meaning of "election laws." *See Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (noting that it is a "fundamental canon of statutory construction ... that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning"). We think that the common meaning of "election laws" is laws that specifically govern elections, rather than generally applicable laws that may affect elections. If the Texas legislature wanted § 31.003 to cover the latter, we doubt that it would have inserted the adjectival modifier "election" directly before the noun "law." By forming an open compound phrase such as "election law," the Texas legislature meant "a combination of separate words that are so closely related as to constitute a single concept." Chicago Manual of Style § 6.33 (14th rev. ed. 1993). An "election district," for instance, is not a district devised for many functions, including elections; it is "a district created for the purposes of elections." 5 Oxford English Dictionary 116 (2d ed. 1989). Moreover, an "election board" is not an agency that carries out all the responsibilities of a municipality, including elections; it is an agency "charged with the conduct of elections." Black's Law Dictionary 519 (6th ed.1990).

---

*Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), it would abstain from ruling on the case and thus dismissed the United States' complaint. *Pullman* requires a federal court to abstain when state law is uncertain and a state court's clarification of state law might make a federal court's constitutional ruling unnecessary.

This analysis suggests that the ADA is not an election law. First, the ADA does not include even a single provision specifically governing elections.  On the contrary, the statute never refers to elections.  Indeed, the statute only mentions voting once, and that is in the "findings and purpose" section. This section, 42 U.S.C. § 12101(a)(3), notes that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services...."  The mere mention of the word "voting" here does not transform the ADA into an "election law."  Such a tangential allusion is insufficient to impose on the Secretary the rather extraordinary duty of ensuring that local election officials interpret and apply the ADA uniformly. *Cf. Pennhurst State School and Hosp. v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981) (explaining that "bill of rights" section of Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6010, "is simply a general statement of "findings' and, as such, is too thin a reed to support the rights and obligations read into it by the court below").

Second, as a general civil rights statute, the ADA involves *every* area of law.[9]  If the ADA is construed as an "election law,"

_____

[9]The ADA's stated purpose is to eliminate discrimination against disabled people and provide enforceable standards addressing discrimination against disabled people.  42 U.S.C. § 12101(b)(1), (2).

then it presumably could also be called an employment law, housing law, transportation law, and so on.  However, we do not think that the common, ordinary meaning of "election laws" includes a law that can be characterized in so many different ways.  Rather, "election laws" only covers laws that specifically relate to elections, such as the Voting Rights Act of 1965, 42 U.S.C. §§ 1972-1973, or the Voting Accessibility for the Elderly and Handicapped Act, 42 U.S.C. § 1973ee-1.[10]

Third, if the Secretary is responsible for guaranteeing that local election officials comply with the ADA, then presumably he would also have a duty to warrant that these officials follow every other general civil rights statute that could touch on elections. These statutes would include, among others, the Civil Rights Act of 1870, 42 U.S.C. § 1981;  the Civil Rights Act of 1871, 42 U.S.C. § 1983;  the Ku Klux Klan Act of 1871, 42 U.S.C. §§ 1983, 1985, and 1986;  the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a, 2000d, and 2000e;  the Education Amendments of 1972, 20 U.S.C. § 1681;  the Age Discrimination Act, 29 U.S.C. § 623;  the Indian Civil Rights Act of 1968, 25 U.S.C. § 1301;  and various amending statutes such as the Civil Rights Restoration Act of 1987, Pub.L. No. 100-259, 102 Stat. 28 (1988).  In addition, the Secretary would need to ensure that local election officials follow other generally applicable laws which could pertain to elections, such as statutes

---

[10]Note that "election laws" could very well apply to specific election provisions that form part of a more general civil rights statute.  *See, e.g.,* 42 U.S.C. § 1971 (voting rights provisions of the Civil Rights Act of 1964).

19

dealing with littering, zoning, fire safety, and so on. We do not believe that the Texas legislature intended § 31.003 to require the Secretary to provide "detailed and comprehensive written directives and instructions relating to and based on" these statutes, at least to the extent that they do not *specifically* pertain to elections.

In sum, we conclude that the phrase "election laws outside this code" only encompasses laws that specifically govern elections, not generally applicable laws that might cover some aspect of elections. Thus, neither § 31.003 nor § 31.004 imposes a duty on the Secretary to ensure statewide compliance with the ADA by the political subdivisions that administer elections in Texas.[11]

Two other provisions in the Texas Election Code place responsibility on the Secretary for approval of voting systems and equipment used in Texas elections. Section 122.031 states that "[b]efore a voting system or voting system equipment may be used in an election, the system and a unit of the equipment must be approved by the secretary of state...." Section 122.038 provides that the Secretary "shall approve the system or equipment" after reviewing reports on the system or equipment prepared by designated examiners and determining that it "satisfies the applicable

---

[11]The plaintiffs maintain that Deputy Assistant Secretary of State Ann McGeehan "conceded" in her deposition that the ADA is an "election law" for purposes of Texas Election Code § 31.003. However, we review all issues of statutory interpretation *de novo, Vinson & Elkins v. Commissioner of Internal Revenue,* 7 F.3d 1235, 1237 (5th Cir.1993), and are not bound by the district court's construction of a statute—let alone a party's. Moreover, review of McGeehan's deposition testimony demonstrates that, rather than conceding that the ADA is an "election law," McGeehan was unsure whether it was.

requirements for approval."

The plaintiffs maintain that the Secretary has violated the ADA because he has not approved equipment accessible to blind voters. The plaintiffs construe §§ 122.031 and 122.038 as obliging the Secretary to take affirmative steps to solicit and approve equipment that ensures a completely secret ballot for blind voters. The plaintiffs do not, however, specify where in §§ 122.031 and 122.038 they find this expansive duty, particularly in the absence of any evidence that the Secretary has refused approval of voting equipment that satisfies the plaintiffs' desires. The plaintiffs' assertion that a voting machine for blind voters exists does not prove that the Secretary violated the ADA because the plaintiffs do not allege—let alone prove—that they presented any voting machine to the Secretary or that he failed to approve such a machine. Perhaps the plaintiffs could state a claim under the ADA if they demonstrated that the Secretary wrongly refused to approve such equipment after it was presented to him for approval. However, the record does not reveal that the Secretary has considered any voting equipment that "satisfies the applicable requirements" and then failed to permit it. As a result, the plaintiffs have not demonstrated the Secretary's responsibility for the alleged ADA violations.

With regard to mobility-impaired voters, we note that § 43.034 of the Texas Election Code places responsibility for accessibility of polling places to the elderly and physically handicapped on the "commissioners court[s]" and the "governing body

21

of each political subdivision that holds elections." The district court stated that § 43.034 imposes a statutory duty on local political subdivisions, but that the statute is unclear about how it is enforced. Without explanation, the district court concluded that it "is of the opinion that the final enforcer of this section is the Secretary of State." Thus, the district court found that the Secretary violated the ADA because some buildings used as polling places are not accessible to mobility-impaired voters.

We disagree with the district court's conclusion. Section 43.034 directs local election officials, not the Secretary, to ensure accessibility of polling places to elderly and physically handicapped voters. However, since § 43.034 is clearly an "election law," we note that § 31.003 commands the Secretary to obtain and maintain uniformity in the application, operation, and interpretation of § 43.034. This means that the Secretary has a duty to maintain uniformity in the operation of a statute that requires local election officials to ensure the accessibility of polling places.

In this regard, the plaintiffs assert that local election officials implement § 43.034 differently and that the Secretary has not issued "detailed and comprehensive written directives and instructions" suggesting that the officials administer that section in a particular way. To allege an ADA violation, though, the plaintiffs must also maintain, among other things, that they are being denied the benefit of a service for which the Secretary is responsible. Here, the service the Secretary has to perform is

22

obtaining the uniform operation of § 43.034. While the plaintiffs may receive a benefit from the accessibility mandate of § 43.034, they do not receive any benefit from the *uniformity* of this mandate. For instance, assume that local election officials interpret the accessibility mandate differently. Some officials believe that § 43.034 requires them to provide special scooters to ferry handicapped voters from the parking lot to the polling place; others disagree. The Secretary could carry out his duty under § 31.003 either by informing local election officials that § 43.034 does not compel the provision of special scooters or by directing local officials to offer such scooters. In other words, the Secretary can ensure uniformity by acting *either* to increase or decrease accessibility on the margin; uniformity *in and of itself* confers no benefit on the disabled. Thus, we determine that while the Secretary has a state-imposed legal duty to ensure the uniformity of the application, operation, and interpretation § 43.034, this uniformity—without more—cannot be a "benefit" to the plaintiffs for purposes of the ADA and the alleged denial of uniformity cannot be an example of discrimination under the ADA. Accordingly, the Secretary cannot be held liable for violation of the ADA because some polling places are inaccessible to mobility-impaired voters.

Finally, § 35.105 of the ADA implementing regulations requires a public entity to "[e]valuate its current services, policies, and practices, and the effects thereof ... [and] proceed to make the necessary modifications." 28 C.F.R. § 35.105(a). The

23

plaintiffs argue that the Secretary violated the ADA by failing to perform this "self-evaluation." The plaintiffs maintain that "[t]he Secretary's abject failure ... most notably by failing to prepare a self-evaluation plan, played a pivotal role in ensuring that, as of the trial in this case, no efforts had been made in Texas to adapt or invent voting systems that would provide secrecy of the ballot for voters who are blind...." The plaintiffs describe § 35.105 as creating a "duty" on the part of the Secretary "to take the initiative and explore, through all means reasonably available, solutions to the discrimination faced by voters who are blind."

Central to the plaintiffs' argument here is the premise that § 35.105 requires the Secretary to evaluate the practices of every electoral subdivision in Texas. We find such an interpretation of the regulation unreasonable. To the contrary, we read § 35.105 as merely requiring the Secretary to evaluate his department, an evaluation the Secretary performed. In fact, even the plaintiffs' counsel admitted before the district court that the Secretary performed an internal self-evaluation.

In sum, the Secretary has no duty under either Texas law or the ADA to take steps to ensure that local election officials comply with the ADA. While the Secretary has a duty to approve certain voting equipment, the plaintiffs have failed to allege facts suggesting a breach of that duty. In addition, while the Secretary has a duty to maintain uniformity in the administration of § 43.034 and arguably breached that duty, he could not have

24

denied any benefit to the plaintiffs. Therefore, we determine that the plaintiffs have failed to state a claim under the ADA against the Secretary.

III

Based on the foregoing, we REVERSE the judgment of the district court and RENDER judgment in favor of the Secretary of State of Texas.

25