UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-51081
_____


PATRICIA J. MATASSARIN, Individually, for and on behalf
of The Great Empire Broadcasting Employee Stock
Ownership Plan and its Beneficiaries; for and on behalf
of that class of persons, participants and/or
Beneficiaries of The Great Empire Broadcasting
Employees Stock Ownership Plan, Past or Present,
Defrauded,

                        Plaintiff-Appellant,

          versus

F.F. MIKE LYNCH, Individually and as Trustee for The
Great Empire Broadcasting Employees Stock Ownership
Plan (ESOP); MICHAEL C. OATMAN, Individually and as
Trustee for The Great Empire Broadcasting Employees
Stock Ownership Plan (ESOP); DANNY E. JENKINS,
Individually and as former Trustee of the ESOP and
Agent of the Trustees and Agent of the Administrator of
The Great Empire Broadcasting Employees Stock Ownership
Plan; Great Empire Broadcasting, Inc., Individually and
as a Plan Administrator for The Great Empire
Broadcasting Employees Stock Ownership Plan, and The
Great Empire Broadcasting Employees Stock Ownership
Plan "Administrative Committee"; GREAT EMPIRE
BROADCASTING INC., Individually and as Plan
Administrator for the Great Empire Broadcasting
Employees Stock Ownership Plan; KAREN K. WARNER, CPA,
Individually and as a member of the Great Empire
Broadcasting Employees Stock Ownership Plan
"Administrative Committee"; UNKNOWN MEMBERS OF THE
"BOARD OF DIRECTORS", of the Great Empire Broadcasting
Employees Stock Ownership Plan; MENKE & ASSOCIATES,
INC.; DON T. BUFORD; CURTIS W. BROWN,

                        Defendants-Appellees.

_____

Before EMILIO M. GARZA, BENAVIDES, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

Plaintiff Patricia Matassarin appeals the district court's grants of summary judgment dismissing her ERISA and securities claims. We affirm.

I

In this unusual employee benefits matter, Patricia Matassarin, who is the plaintiff/appellant *and* the current plaintiff's attorney of record, brought suit against the Great Empire Broadcasting, Inc. ("Great Empire") employee stock ownership plan ("ESOP" or "Plan") and its fiduciaries and author. The Great Empire ESOP is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.

Until 1988, appellees Mike Lynch and Michael Oatman owned 75 and 25 percent of Great Empire, respectively. Great Empire established the ESOP effective January 1, 1988, by document executed on October 21, 1988, in order to distribute Lynch's and Oatman's shares more widely among Great Empire employees. The Plan was restated on November 15, 1994. The restatement, which brought the Plan into compliance with certain tax code provisions, was deemed retroactive to January 1, 1989. Appellee Menke & Associates, Inc. drafted the original documents

establishing the ESOP and continues to provide ministerial services to Great Empire but does not serve as the Plan administrator. Every Great Empire employee who satisfies the ESOP's service requirements and who is not subject to a collective bargaining agreement automatically becomes a Plan participant. As Great Empire makes all contributions to the Plan, employee participants do not contribute directly.

Appellant Matassarin was married to appellee Danny Jenkins, Great Empire's chief financial officer and a participant in the Great Empire ESOP, until the couple divorced on October 15, 1991. Upon their divorce, Jenkins and Matassarin entered into a qualified domestic relations order ("QDRO"), which was approved by a Kansas state court. Menke & Associates suggested the terms of the QDRO. Under the QDRO, Jenkins agreed to assign Matassarin one-half of his interest in the Great Empire ESOP. Great Empire would hold Matassarin's interest in a segregated account, where it would accrue interest at the rate of a one-year certificate of deposit.[1] The QDRO did not specify how long Great Empire would

_____

1. Paragraphs 4 and 5 of Matassarin and Jenkins's QDRO state:

> 4. The Husband assigns to the Wife as Alternate Payee one-half of his interest of the assets accredited to Participant's ESOP Accounts as of October 15, 1991. This assignment of benefits will require that the Administrator of the Great Empire Broadcasting, Inc. ESOP segregate the Alternate Payee's interest, and that said segregated account will continue to accumulate interest at a rate equivalent to a one-year Certificate of Deposit.
> 5. This assignment of benefits does not require

retain Matassarin's interest or when it would pay any distribution directly to her. Matassarin was represented by counsel when she agreed to the QDRO.

On the day of Jenkins's divorce from Matassarin, his Great Empire ESOP account held 1040.171 total shares. The Plan administrator segregated 520.086 of those shares into an account for Matassarin. The Plan administrator valued Matassarin's 520.086 shares at $22 per share, their market value at the end of 1990, the Plan's last determination date for value. Matassarin's interest in the Plan, thus calculated, totaled approximately $11,442. The Plan administrator then allowed Matassarin's account to accumulate interest at the rate of a one-year certificate of deposit.

When Great Empire restated its Plan on December 15, 1994, Michael Oatman sent a letter to everyone who had a segregated account under the original Plan. Most of the segregated-account holders, approximately sixty-seven people, were Plan participants who had left Great Empire's employment and had accounts established pursuant to Plan § 14(h).[2] The letter stated that the

_____

that the Plan provide any type or form of benefit, or
any option, not otherwise provided under the Plan
. . . .
Paragraph 5 reflects the language of 29 U.S.C. § 1056(d)(3)(D).

2.  Section 14(h) of the original Plan provided, in part,
that a Plan participant's segregated account would earn interest
equivalent to that paid on a one-year certificate of deposit
("CD"):
        Any part of a Participant's Plan Benefit which is

ESOP administrative committee[3] had authorized lump-sum distributions to segregated-account holders. The letter offered distributions either in cash or in shares of Great Empire stock. Matassarin contends that she never received this letter, and in any event she did not respond to it. Oatman sent follow-up correspondence to Matassarin and other segregated-account holders in May 1995,[4] which reiterated the distribution offer but failed to mention that segregated-account holders could select shares of company stock as their form of distribution. The appellees now contend that Matassarin, unlike other segregated-account holders, was not entitled to *any* distribution and was sent Oatman's

retained in the Trust after the Anniversary Date coinciding with or immediately following the date on which he terminates employment will be credited to a separate account in the name of the Participant, and such account shall be credited with interest on the unpaid principal balance at the rate paid on one-year certificates of deposit (as of the beginning of each Plan Year) by any bank or savings and loan association designated, in its sole discretion, by the Committee. . . . The balance in a Participant's undistributed account shall represent his interest in the Company Stock Account and the Other Investments Account. However, except in the case of reemployment (as provided for in Section 4), none of his Accounts will be credited with any further Employer Contributions or Forfeitures.

Section 14(g) of the amended Plan provides essentially similar language.

3. The administrative committee oversees the trustees' actions. Lynch and Oatman, along with appellees Karen Warner, Don Burford, and Curtis Brown, comprise the committee.

4. It appears from the record that all segregated-account holders who failed to respond to the December received such follow-up correspondence.

correspondence only in error. According to the appellees, § 18(e)(4) in both the original and the restated Plan provides that the Plan need not offer Matassarin any distribution until Jenkins is eligible for retirement. Section 18(e)(4) states: "In the case of any payment to an Alternate Payee before a Participant has separated from service, the Plan shall not be required to make any payment to an Alternate Payee prior to the date Participant attains (or would have attained) the Earliest Retirement Age." It is not clear from the record how many of the segregated-account holders received payment. For those who did, the Plan administrator converted the "suspended" stock, i.e., that in the segregated accounts, to cash value for distribution, then reallocated the stock among active Plan participants. For distribution purposes, the Plan apparently valued the suspended stock by the fair market value for whichever year-end preceded the relevant employee's termination from Great Empire employment. The Great Empire ESOP defines the "valuation date" as the December 31 "coinciding with or immediately preceding the date of actual distribution of Plan Benefits."

On May 9, 1996, Matassarin brought suit in the United States District Court for the Western District of Texas against Lynch, Oatman, Jenkins, Great Empire, Warner, Menke & Associates, and unknown members of Great Empire's Board of Directors. She alleged that the defendants committed common-law fraud and violated ERISA, federal securities laws, and state securities laws.

Matassarin filed a motion for class certification, with herself as the representative plaintiff, which the district court denied. She then filed a motion to have her suit treated as a shareholder's derivative action, or alternatively for joinder, or alternatively for reconsideration of the district court's decision denying class certification. The district court denied the motion *in toto*.

The district court then granted partial summary judgment against Matassarin on her federal securities claims against Lynch, Oatman, Jenkins, Warner, Great Empire, and Menke & Associates. Matassarin amended her complaint, adding Burford and Brown, members of the ESOP administrative committee, as defendants. The court granted partial summary judgment on Matassarin's federal securities claims against Burford and Brown, as well.

The court next granted partial summary judgment for all of the defendants on Matassarin's fraud, conversion, and state securities claims.

The defendants filed a motion for partial summary judgment on Matassarin's claim for attorneys' fees. The district court granted summary judgment with regard to any legal work done or supervised by Matassarin but denied the motion as to work done by other attorneys.[5]

---

5. The law firm of Brin & Brin, P.C., where Matassarin worked as an attorney, originally represented Matassarin in this

The district court then ordered Matassarin to file an amended complaint including only claims that still remained after the summary judgment grants. Matassarin did so, alleging only ERISA violations. The court thereafter struck Matassarin's jury demand and, in two separate orders, granted summary judgment for the defendants on Matassarin's ERISA claims, effectively ending her suit.

Matassarin also filed a motion requesting that Judge Prado, the presiding judge, recuse himself from the case on the basis of alleged bias. The judge denied the motion, prompting Matassarin to petition this Court for a writ of mandamus directing Judge Prado to recuse himself. A three-judge panel of this Court denied the petition and Matassarin's subsequent motion for rehearing on the issue.

Both Matassarin and the defendants filed motions seeking to recover attorneys' fees. The district court denied Matassarin's motion but, finding Matassarin's ERISA suit "frivolous," awarded more than $24,000 in attorneys' fees to Menke & Associates and more than $88,000 to the other defendants.

Matassarin now appeals the district court's refusal to

---

matter. Matassarin signed many of the Brin & Brin pleadings herself. At some time during these proceedings, Matassarin's employment with Brin & Brin ended and Brin & Brin ceased representing her. Matassarin, unable to find counsel who would take the case on a contingent-fee basis, began to handle the case alone.

certify her proposed classes;[6] the grants of summary judgment on her ERISA and securities claims; the striking of her jury demand; Judge Prado's refusal to recuse himself; and the denial of her motion for attorneys' fees. The district court awarded attorneys' fees to the defendants after Matassarin filed her first notice of appeal. As such, Matassarin contests that award as part of a separate appeal, No. 98-50473, which is not now before this Court.

## II

Matassarin requested certification of three classes. First, she asked the district court to certify a class of all Great Empire ESOP participants, on whose behalf she sought to resolve "ambiguity between the Plan Documents, specifically, which Plan Document governs 'distribution' and 'valuation' decisions"; and "to unseat the [Plan] Trustees for fraudulent misrepresentations, conflict of interest, failure to comply with the Plan Document, and/or incompetence." Second, Matassarin sought to certify a class of all Plan beneficiaries who were offered lump sums for their segregated accounts. She contended that these beneficiaries were denied the fair value of their interests and "have been the

---

6. Matassarin raises the following issue on appeal: "The District Court erred in finding that Matassarin was not a 'suitable' representative for Class Action and/or Joinder and/or a Shareholder's Derivative Action and in denying Motions pertaining to each." Within her brief, however, Matassarin addresses only the issue of class certification. We therefore deem the issues of joinder and shareholder's derivative abandoned on appeal by Matassarin and do not consider them further.

-9-

victim[s] of misrepresentations concerning the fair value of their benefits and/or their ability to elect distribution in the form of stock." Finally, Matassarin sought certification for "QDRO beneficiaries whose valuations were frozen at the time of their divorce[s]."

A district court has wide discretion in deciding whether to certify a proposed class. *See Applewhite v. Reichhold Chemicals, Inc.*, 67 F.3d 571, 573 (5th Cir. 1995). So long as the district court considers the four Rule 23 criteria,[7] this Court will reverse the decision only if the district court abused its discretion. *See Lightbourn v. City of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997).

The district court in this case did not abuse its discretion. The court mentioned and considered the Rule 23 prerequisites. Accurately considering Fifth Circuit precedent, the court found that Matassarin's "continuing and virulent antagonism" against defendant Jenkins, her prior litigation against Jenkins, her admission that she might bring another claim

---

7. Federal Rule of Civil Procedure 23 lists four prerequisites to a class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(A).

against the defendants, and her probable unwillingness to settle made her an inappropriate representative. *Cf.* Fed. R. Civ. P. 23(A). We see no abuse of discretion in this decision. Matassarin's pleadings make specific reference to information, presumably passed in confidence from spouse to spouse before the divorce, regarding Jenkins's motivation in helping establish the ESOP and his desire to benefit himself. Based on such pleadings and on the nature of this case, the district court reasonably found that Matassarin might be more interested in hurting her ex-husband than in ensuring adequate representation for a class. In addition, the district court rightly found that Matassarin could not serve as both the representative plaintiff and the class attorney; her duty to represent class interests would impermissibly conflict with her chance to gain financially from an award of attorneys' fees. The Fifth Circuit frowns upon a named plaintiff's partner or spouse serving as counsel for a class. *See, e.g.*, *Phillips v. Joint Legislative Committee on Performance and Expenditure Review*, 637 F.2d 1014, 1023 (5th Cir. 1981); *Zylstra v. Safeway Stores, Inc.*, 578 F.2d 102, 104 (5th Cir. 1978). It follows that the same reasoning should prevent a named plaintiff herself from serving as counsel. *See Zylstra*, 578 F.2d at 104 ("We are persuaded . . . that attorneys . . . who themselves are members of the class of plaintiffs should be subject to a per se rule of disqualification under Canon 9 [of

-11-

the Code of Professional Responsibility] and should not be permitted to serve as counsel for the class."). Finally, even apart from those grounds upon which the district court explicitly relied, several other considerations support the denial of class certification. These include Matassarin's atypical position as a QDRO beneficiary to the ESOP--Matassarin herself spends pages of her reply brief to this Court arguing that she was in fact discriminated against and treated differently than other ESOP participants, including other segregated-account holders--and the likely failure of at least one of her proposed classes to meet Rule 23's numerosity requirement.

Accordingly, the district court's decision to deny class certification did not constitute an abuse of discretion.

III

We affirm the district court's grant of summary judgment for the defendants as to Matassarin's state and federal securities claims.

A.  *Federal Securities Claims*

A cause of action falls under the 1933 Securities Act and the 1934 Securities Exchange Act only if the interest involved constitutes a "security" under § 2(1) of the '33 Act, 15 U.S.C. § 77b(a)(1),[8] or § 3(a)(10) of the '34 Act, 15 U.S.C.

---

8.  Section 77b(a)(1) provides:
    The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation

-12-

§ 78c(a)(10).[9] Neither Act specifically includes any sort of ERISA-type plan in its definition. The few courts addressing whether such plans are securities have focused on whether the plans constitute "investment contracts" under the Acts. *See, e.g.*, *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 99 S. Ct. 790 (1979); *Uselton v. Commercial Lovelace Motor Freight*, 940 F.2d 564 (10th Cir. 1991). An investment contract has three components: It (1) involves an investment of money (2) in a common enterprise (3) with profits to come solely from the efforts of others. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S. Ct. 1100, 1104 (1946). Matassarin contends that language in the Great Empire ESOP document--such as "stock" and "security"-- establishes that an interest in the ESOP is a security. This

---

in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

9. Section 78c(a)(10)'s definition of "security" is similar to that of § 77b(a)(1).

argument is without merit. The *Howey* test "is to be applied in light of 'the substance--the economic realities of the transaction--rather than the names that may have been employed by the parties.'" *Daniel*, 439 U.S. at 558, 99 S. Ct. at 796 (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851-52, 95 S. Ct. 2051, 2060 (1975)). Matassarin also argues that the Tenth Circuit's reasoning in *Uselton*, the only case since *Daniel* in which a circuit court discussed at length whether an ESOP constitutes a security, should control in this case. We agree that *Uselton*'s reasoning is persuasive, but we find that the Great Empire ESOP, considered under *Daniel* and *Uselton* together, is not subject to '33 or '34 Act protection.

*Daniel* involved a union-established pension plan to which employers contributed. Every union member had to belong to the plan and could not have the employer contributions paid directly to him instead of to the plan. Every plan participant who served 20 continuous years with the union received identical "defined" pension benefits after retirement. The employers made uniform contributions for each week an employee worked. An employee did not have an individual account tied to employer contributions attributable to his period of service. When the union denied benefits to member John Daniel after he retired, Daniel sued under the '33 and '34 Acts. The Court found that the union pension plan did not constitute an "investment contract" under

-14-

*Howey*. First, the Court found that the plan did not include an "investment of money": The plan collected a small part of each employee's compensation package, but the employee did not pay any "tangible and definable consideration in return for an interest." *Daniel*, 439 U.S. at 560, 99 S. Ct. at 797. Furthermore, no fixed relationship existed between employer contributions to the fund and an employee's potential benefit. "Looking at the economic realities," the Court wrote, "it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment." *Id.* at 560, 99 S. Ct. at 797. Second, the Court reiterated that, as it had stated in *Forman*, "the 'touchstone' of the *Howey* test 'is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *Id.* (quoting *Forman*, 421 U.S. at 852, 95 S. Ct. at 2060). Although the union pension fund in *Daniel* depended some on earnings from its assets, "a far larger portion of its income [came] from employer contributions, a source in no way dependent on the efforts of the [plan's] managers." *Id.* at 562, 99 S. Ct. at 797. An employee's receipt of benefits was not tied to the financial health of the plan but instead to the employee's meeting eligibility requirements. Therefore, "viewed in light of the total compensation package an employee must receive in order to be eligible for pension benefits, it [became] clear that the

possibility of participating in a plan's asset earnings '[was] far too speculative and insubstantial to bring the entire transaction within the Securities Acts.'" *Id.* at 563, 99 S. Ct. at 798 (quoting *Forman*, 421 U.S. at 856, 95 S. Ct. at 2062).

*Uselton* concerned an entirely different type of plan, an ESOP. In 1984, Pepsico, Inc. sold Lee Way Motor Freight ("Lee Way"), a wholly owned subsidiary, to Commercial Lovelace ("CL"). Almost immediately, CL began encouraging Lee Way's union employees to participate in CL's year-old wage-reduction program. The program allowed an employee to take a voluntary 17.35-percent reduction in wages in exchange for profit sharing and an interest in CL's existing ERISA-governed ESOP. The ESOP established individual accounts for participants, allocating shares of CL stock according to the employee's compensation. Within a year, CL merged with Lee Way and filed for bankruptcy. Pepsico thereafter allegedly reacquired Lee Way's former assets. Union employees who had chosen to participate in the wage-reduction program charged that Pepsico's sale of Lee Way and CL's rapid demise were a sham transaction to facilitate and disguise Pepsico's liquidation of Lee Way. They brought suit to recover their contributed wages, relying in part on federal securities laws.

The Tenth Circuit acknowledged that "an employee benefit plan that is either noncontributory or compulsory is not an investment contract because it does not allow a participant to

make the 'investment' required by the first prong of the *Howey* test." *Uselton*, 940 F.2d at 573-74. The court noted, however, that in the CL ESOP, each union employee who chose to join gave up specific consideration--a portion of his wages--and thus made an investment. *See id.* at 575-76. The court also held that the CL ESOP satisfied the third *Howey* prong, as it would produce capital-appreciation profits and/or allow participation in earnings resulting from the investment: "[A]ny profit on plaintiffs' ESOP interest would occur through dividend distributions and appreciation in the value of the stock allocated to their accounts, which in both cases would result primarily from the efforts [of] CL's managers and its employees." *Id.* at 576-77.

Under the Tenth Circuit's reasoning, the Great Empire ESOP meets *Howey*'s third prong. Nonetheless, under both *Uselton* and *Daniel*, the Great Empire ESOP fails *Howey*'s first prong; it is not a voluntary investment choice, but instead a mandatory, employer-funded program.[10] Matassarin therefore cannot maintain a federal securities action, and the district court's grant of summary judgment is affirmed as to that claim.

_____

10. Matassarin seeks to defeat this point by arguing that "an individual may use cash to purchase shares of stock." This argument misrepresents the Plan provision she cites, § 17(b), which provides only that a participant may leave a portion of his distributions, if any, in the Plan for reinvestment. This is not equivalent to using cash from any source to buy stock.

B.    *State Securities Claims*

Matassarin also brought claims under Texas Business and Commerce Code Section 27.01 and under Texas Civil Statutes article 581 (Blue Sky Law). The district court dismissed Matassarin's state securities claims, stating, "Texas law uses the same basic standards as federal law for determining what constitutes a security. . . . Because this Court has previously ruled that the transaction in the present case do[es] not satisfy the *Howey* test for what constitutes a security, the Court concludes that Texas state law would arrive at the same result." The district court cited *Wilson v. Lee*, 601 S.W.2d 483, 485 (Tex. Civ. App.—Dallas 1980, n.w.h.), for the proposition that federal precedent defining a "security" also applies to the definition of a security under Texas state law. But neither *Wilson* nor other cases that state this proposition[11] deal with an ESOP interest. In fact, Texas law may differ from federal law as to whether an ESOP interest is a security. Texas Civil Statutes article 581 provides, in part:

The term "security" or "securities" shall include . . . any certificate or instrument representing or

---

11.    *See, e.g.*, *Callejo v. Bancomer*, 764 F.2d 1101, 1125 n.33 (5th Cir. 1985); *Campbell v. C.D. Payne & Geldermann Sec., Inc.*, 894 S.W.2d 411, 417 (Tex. App.—Amarillo 1995, writ denied); *First Municipal Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart*, 648 S.W.2d 410, 414 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referenced or not.

Tex. Rev. Civ. Stat. art. 581—4(A). Unlike the federal securities law definitions of a "security" found in 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10), the Texas statute may well be broad enough to include a nonvoluntary ESOP interest. We need not reach the issue, however, because even if the Great Empire ESOP constitutes a security under Texas law, Matassarin cannot maintain her state securities action.

Matassarin bases her action upon Texas Revised Civil Statutes article 581—33(B) and upon Texas Business and Commerce Code § 27.01(a)(1). The former provision states in part:

A person who offers to buy or who buys a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person selling the security to him, who may sue either at law or in equity for recision or for damages if the buyer no longer owns the security.

Tex. Rev. Civ. Stat. art. 581—33(B). Texas Business and Commerce

Code section 27.01 applies to fraud in stock transactions. That section provides in part:

> Fraud in a transaction involving . . . stock in a corporation or joint stock company consists of a . . . false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person entering into the contract . . . .

Tex. Bus. & Com. Code § 27.01(a)(1). Requisite to an action under these statutes is an "untrue statement of a material fact or an omission to state a material fact" or a "false representation." Matassarin's state securities claim rests upon an issue central to her ERISA argument, namely, that the defendants made misrepresentations concerning her ESOP rights or the value of her benefit. As set forth hereafter in our discussion of Matassarin's ERISA claims, we find that the defendants made no untrue statements of material fact or false representations to her. On that ground, we affirm the district court's grant of summary judgment on Matassarin's state securities claims. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1146 (5th Cir. 1993) (noting that an appellate court may affirm a grant of summary judgment on grounds other than those relied on by the district court).

Matassarin seeks recovery under the Employee Retirement Income Security Act of 1974 for benefits due her under the Plan and relief for various ERISA violations. We find that the district court properly granted summary judgment to the defendants on Matassarin's ERISA claims.[12]

A.   *Denial of Benefits Due*

Great Empire interpreted the Plan and Matassarin's QDRO to require segregation of Matassarin's Plan benefits into an account that will accrue minimal interest until Danny Jenkins reaches retirement age. Matassarin contends that her benefit due should continue to be 520.086 shares of Great Empire shares at current share value, or alternatively that she, along with other segregated-account holders, should have the opportunity to receive a cash distribution equal to the current fair market value of her shares. ERISA § 502(a)(1)(B) states: "A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). As a QDRO recipient, Matassarin has

_____

12.   Because we affirm the grants of summary judgment, we do not consider whether appellee Menke & Associates could face liability as a Plan fiduciary within 29 U.S.C. § 1002(21)(A)'s definition of a fiduciary.

standing to bring these claims. *See Boggs v. Boggs*, 520 U.S. 833,

---, 117 S. Ct. 1754, 1763 (1997) ("In creating the QDRO

mechanism Congress was careful to provide that the alternate

payee . . . is to be considered a plan beneficiary."); *see also*

29 U.S.C. § 1056 (d)(3)(J).

The Great Empire ESOP gives its administrator discretionary

authority to construe the Plan terms.[13] When a plan gives such

discretion, a district court will overrule the plan

administrator's interpretation of plan terms only if the

interpretation is "arbitrary and capricious." *See Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 955

(1989); *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 637-39 (5th

Cir. 1992). The "arbitrary and capricious" review amounts to an

abuse-of-discretion standard. *See McDonald v. Provident Indemnity*

*Life Insurance. Co.*, 60 F.3d 234, 236 (5th Cir. 1995). Applying

the same standards as the district court, this Court reviews the

Great Empire ESOP administrator's interpretation of Plan terms

for abuse of discretion.

We do not afford such deference to the Plan administrator's

interpretation of Matassarin's QDRO. A court reviews de novo a

---

13. Plan § 18(a)(2)(A), in both the original and the amended version, provides, in part, "All decisions required to be made by the [Plan administrative] Committee involving the interpretation, application and administration of the Plan shall be resolved by majority vote either at a meeting or in writing without a meeting."

plan administrator's legal conclusions regarding the meaning of a contract or statute. *Cf. Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990) (reviewing de novo a plan administrator's determination as to whether an employee was an independent contractor for coverage purposes). The QDRO, unlike the Plan, is a separate, judicially approved contract between Jenkins and Matassarin, which the Plan administrator has no special discretion to interpret. Although we allow a plan administrator discretion to determine whether an agreement constitutes a QDRO under the plan, we otherwise review de novo a plan administrator's interpretation of the meaning of a QDRO. *See Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 114 (3d Cir. 1994) (finding that a district court "did not err in holding that it should review de novo the plan administrator's construction of the [divorce agreement], which invoked issues of contract interpretation under the Agreement and not the plan").

1. *The Nature of Matassarin's Interest*

Congress created the QDRO structure in the Retirement Equity Act ("REA") of 1984, which amended ERISA. Through the REA, Congress enhanced ERISA's protection of divorced spouses and their interest in retirement funds earned during marriage. *See Boggs*, 520 U.S. at ---, 117 S. Ct. at 1763. "The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available

-23-

during their retirement as a means of income." *Id.* at ---, 117 S. Ct. at 1767. In order to accomplish this, the REA amendments require that "[e]ach pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." 29 U.S.C. § 1056(d)(3)(A). Furthermore, "[e]ach plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." 29 U.S.C. § 1056(d)(3)(G)(ii).

The QDRO in this case assigned Matassarin one-half of Jenkins's "[i]nterest [in] the assets accredited to [his] ESOP Accounts as of October 15, 1991." It also "require[d] that the Administrator of the Great Empire Broadcasting, Inc. ESOP segregate [Matassarin's assigned] Interest, and that said segregated account . . . continue to accumulate Interest at a rate equivalent to a one-year Certificate of Deposit." These two requirements' opaqueness makes it understandable that Matassarin might question the treatment of her account. We seek here to provide clarification.

Matassarin contends that she is entitled to more than the simple interest that will accumulate on her segregated shares' cash value as of the last valuation date before the segregation. She contends that she should receive the cash value of 520.086 shares at whatever time the Plan passes the benefits to her. We

disagree. The ESOP defines the "valuation date" as the December 31 "coinciding with or immediately preceding the date of actual distribution of Plan Benefits." Matassarin states that because the Plan has not made a distribution to her, the administrator erred by valuing her shares as of the divorce date. The QDRO, however, contravenes the interpretation that Matassarin urges. Necessarily reducing Matassarin's interest to cash value is implicit in the QDRO, because cash principal can accumulate interest, whereas shares, owing to their fluctuating value, cannot. To read the QDRO as requiring Matassarin to receive the total of 520.086 shares valued at the date of payment to Matassarin would render meaningless the QDRO provision pertaining to interest. The Plan administrator instead valued Matassarin's interest at the date of segregation--that is, distribution to her interest-accumulating segregated account. In light of the QDRO provisions, the Plan administrator's interpretation was legally correct.

Matassarin also argues that the Great Empire ESOP--specifically, restated § 18(e)(1)--supports her position. Under that provision, the Plan administrator must segregate a QDRO beneficiary's account and "continue to [treat it] in the same manner as the affected Accounts of the Participant," albeit absent further contributions or forfeitures from Great Empire. The appellees argue that the restated Plan, although retroactive to 1989, should not apply to Matassarin's QDRO, because at the

time that the QDRO was entered, the original Plan provisions were effective. The appellees' reasoning is not self-evident, and one might plausibly argue that the 1994 restatement should indeed apply to Matassarin's QDRO.[14] That issue, however, is a matter of Plan interpretation, which we review under the abuse-of-discretion standard. No matter which interpretation this Court might prefer, the Plan administrator did not act arbitrarily and capriciously in finding that the provisions added to § 18(e)(1) in 1994 do not govern Matassarin's QDRO.

2.  *Distribution of Benefits*

Matassarin argues that she is currently entitled to distribution of her benefit, that beneficiaries under the ESOP may select distribution of benefits "in the form of employer securities," and that beneficiaries have an option to "put" those securities back for fair market value. Matassarin argues that two tax code provisions--26 U.S.C. § 409(h)[15] and 26 U.S.C.

---

14.  In the original Plan § 19(a), Great Empire "reserve[d] the right to amend the Plan at any time and from time to time, in whole or in part, including without limitation, retroactive amendments . . . ." Matassarin became a Plan beneficiary on October 15, 1991, and remained so in 1994, when the Plan was restated. Section 1(b) of the 1994 restatement rendered the restatement's provisions retroactive to January 1, 1989. The restatement does not except segregated accounts from retroactive application of its terms. Thus, at the time that Plan fiduciaries offered Matassarin a distribution in December 1994 or May 1995, they might have been able to treat Matassarin's account--a "segregated account" as established under the Plan--as subject to the restated Plan.

15.  That statute provides, in part:
     A plan meets the requirements of this subsection

§ 4975(e)(7)[16]--mandate these beneficiary options in a tax-exempt plan such as the Great Empire ESOP. Matassarin is correct that, under those provisions, ESOP participants who are entitled to distribution must be able to demand employer securities as the form of distribution. She is, however, mistaken to contend that she is now entitled to a distribution. Although the QDRO fails to specify the date of distribution, § 18(e)(4) in both the original and the restated Plan provides that no distributions need be made to Matassarin before Jenkins reaches retirement eligibility. The Retirement Equity Act recognizes that a QDRO may delay distribution until the Plan participant could retire. *See* 29 U.S.C. § 1056(d)(3)(E)(i). We see no reason why an ERISA-qualified plan may not do the same.

Matassarin's domestic relations order met the Plan's § 18(e) qualifications. The Plan administrator interpreted the QDRO requirements and harmonized them with the Plan provisions. We find no error in the Plan administrator's interpretation of the

---

if a participant who is entitled to a distribution from the plan—(A) has a right to demand that his benefits be distributed in the form of employer securities, and (B) if the employer securities are not readily tradable on an established market, has a right to require that the employer repurchase employer securities under a fair valuation formula.
26 U.S.C. § 409(h)(1).

16. "A plan shall not be treated as an employee stock ownership plan unless it meets the requirements of section 409(h) . . . ." 26 U.S.C. § 4975(e)(7).

QDRO and no abuse of discretion in its interpretation of the Plan provisions. Accordingly, we affirm the district court's grant of summary judgment to the defendants on Matassarin's ERISA claim for denial of benefits.

B.   *ERISA Violations and Breach of Fiduciary Duty*

Matassarin next contends that the Great Empire ESOP fiduciaries failed to satisfy ERISA requirements and violated their fiduciary duty to her and to the Plan generally. She relies upon ERISA §§ 502(a)(2) and (a)(3).

1.   *Section 502(a)(2)*

Section 502(a)(2) provides a cause of action for injuries caused by violations of ERISA § 509. Section 509 focuses on fiduciary breaches that cause harm to a plan as a whole:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a). The Supreme Court, noting ERISA's primary concern with the possible misuse or poor management of plan assets, has stated that the "loss to the plan" language in § 1109 limits claims to those that inure to the benefit of the plan as a whole and not to the benefit only of individual plan beneficiaries. *See McDonald*, 60 F.3d at 237 (citing *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 140-42 & nn. 8-9, 105 S. Ct. 3085, 3089-90 & nn. 8-9 (1985)). Based upon this statutory purpose, we find that the district court properly granted summary judgment on Matassarin's § 502(a)(2) claim.

Most of the ERISA breaches that Matassarin alleges concern only her individual account or, at most, those of the sixty-seven Plan participants who were offered lump-sum distributions. The exception to this is Matassarin's claim that the defendants failed to conform the Great Empire ESOP to 26 U.S.C. § 409(h) and 26 U.S.C. § 4975(e)(7) and thereby jeopardized the Plan's tax-exempt status. It appears that the original Plan document did fail to allow segregated-account holders to purchase company stock. The amended Plan document remedied that error in order to bring the Plan into compliance with the tax code provisions. The defendants have admitted to omitting mistakenly from the May 1995 follow-up correspondence the fact that participants could select Great Empire securities as the form of distribution. But this omission seems to have been a simple oversight. Nothing in the

record or pleadings indicates that participants who were entitled to distribution were in fact denied the right to demand employer securities, such as would disqualify the Plan under those tax code provisions. Matassarin has failed to allege any way in which the defendants' actions caused a loss to the Plan as a whole as envisioned in § 502(a)(2). We therefore affirm the district court's grant of summary judgment on Matassarin's § 502(a)(2) claim.

2.    *Section 502(a)(3)*

Summary judgment on Matassarin's § 502(a)(3) claim was appropriate only if Matassarin provided no evidence of *any* ERISA violation. Under § 502(a)(3), a plan participant may bring an action

> (A) to enjoin any act or practice which violates any provision of [ERISA's protection of employee benefit rights] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA's protection of employee benefit rights] or the terms of the plan.

29 U.S.C. § 1132(a)(3). A plan beneficiary may bring a § 502(a)(3) action against an ERISA fiduciary based on loss to the individual beneficiary as well as based on loss to the plan as a whole. *See Varity Corp. v. Howe*, 516 U.S. 489, 496, 116 S.

Ct. 1065, 1075-76 (1996) (contrasting § 1132(a)(2) with

§ 1132(a)(3), which does not require loss to the plan as a

whole). Matassarin alleges four types of ERISA violations: (1)

fiduciary self-dealing, (2) failure to invest prudently, (3)

interference with her exercise of protected rights, and (4)

failure to provide information.

### a.   *Fiduciary Self-Dealing*

The Great Empire ESOP in early 1995 reabsorbed suspended

shares in § 14(h) accounts, paying each account holder the value

of his shares as of the December 31 preceding his separation from

the Plan. According to Matassarin, the Plan effectively

repurchased shares for less than the fair market value on the

date of repurchase. Those who benefitted most from this

repurchase, she continues, were (1) the Plan fiduciaries, who

held the largest share accounts in the Plan; and (2) Lynch and

Oatman, whose company, Great Empire, was able to avoid paying

fair market value for the shares. Matassarin argues that these

actions violated ERISA § 406(b), which prohibits fiduciary self-

dealing.[17]

---

17.  A fiduciary with respect to a plan shall not--
    (1)  deal with the assets of the plan in his own
interest or for his own account,
    (2)  in his individual or in any other capacity act in
any transaction involving the plan on behalf of a party (or
represent a party) whose interests are adverse to the
interests of the plan or the interests of its participants
or beneficiaries, or
    (3)  receive any consideration for his own personal
account from any party dealing with such plan in connection

We need not consider the claim in depth. Under § 502(a)(3), a beneficiary may bring an action to enjoin an ERISA violation or for equitable relief. In this case, Matassarin has nothing to enjoin and no equitable relief available to her on behalf of the Plan as a whole. The "repurchase" took place in 1995. The Plan as a whole did not suffer, and Matassarin's individual segregated account was unaffected. Even if Matassarin's § 406(b) allegations are meritorious, the only beneficiaries possibly entitled to relief would be the Plan participants who were allegedly offered less than fair value for the interests in their § 14(h) accounts.[18] As we have stated, the district court did not abuse its discretion in finding Matassarin an inappropriate representative for a class that would include those Plan participants. Whereas Matassarin individually has no § 502(a)(3) relief available to her for § 406(b) violations, the district court properly denied her claim for breach of fiduciary duty.[19]

---

with a transaction involving the assets of the plan. 29 U.S.C. § 1106(b).

18. We make no finding here as to whether any separated Plan participant with a § 14(h) account would have a claim against the Plan fiduciaries.

19. We have not considered whether the duties set forth in § 406(b) necessarily apply in this ESOP situation. ERISA § 408(e) generally exempts ESOP fiduciaries from § 406 requirements when the questioned transaction involves the acquisition or sale of "qualifying employer securities," which include stock. 29 U.S.C. § 1108(e); *see* 29 U.S.C. § 1107(d)(5)(A). Section 408(e) has been interpreted to allow "[a]n ESOP [to] acquire employer securities in circumstances that would otherwise violate Section 406 if the purchase is made for 'adequate consideration.'" *Donovan v.*

    b.    *Failure To Invest Prudently*

Matassarin next argues that the defendants' allowing her segregated account to accrue only minimal interest violates the prudent-person investment standard's diversification requirement under ERISA § 404. ERISA § 404 requires a plan fiduciary to "discharge his duty with respect to a Plan solely in the interest of the participants and beneficiaries and . . . by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C); *see Metzler v. Graham*, 112 F.3d 207, 209 (5th Cir. 1997) (addressing the diversification requirement). The defendants' failure to diversify Matassarin's account did not in any way expose it to the risk of large losses and therefore did not breach an explicit § 404 diversification duty. We are mindful, however, that implicit within § 404(a) is the desirability of increasing a plan's value--preferably ensuring more than passbook interest--through sound investment.[20]

---

*Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983). The more likely challenge involving this exemption would question whether an ESOP paid too much for employer securities. We know of none in which a claimant alleged that an ESOP cheated its former participants by paying too little for employer securities. Whereas Matassarin would not be entitled to relief even if § 406(b) does apply, we need not decide the issue here.

20.    Section 404(a)(1)(B), for example, requires an ERISA fiduciary to discharge his duties as would "a prudent man acting in like capacity and familiar with such matters," which would contemplate increasing the plan's value. 29 U.S.C. § 1104(a)(1)(B).

Nonetheless, Matassarin's QDRO, the terms of which the defendants were bound to apply, requires just passbook interest, rendering it clearly prudent under §404(a)(1)(C) for Great Empire not to diversify in this case.

We recognize the aberrancy and difficulty of Matassarin's situation. In enacting ERISA, Congress sought to ensure that workers who have been promised certain retirement benefits actually receive those benefits. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720, 104 S. Ct. 2709, 2713 (1984). Although the primary purpose of an ESOP differs from that of a pension plan, ESOPs remain subject to ERISA's general protective restrictions and requirements. *See Cunningham*, 716 F.2d at 1463-68. From Matassarin's point of view, the QDRO structure has hurt her retirement prospects. While married to Jenkins, Matassarin no doubt looked forward to enjoying with him

---

ERISA sound-investment requirements do not generally apply to an ESOP, which is "designed to invest primarily in securities issued by its sponsoring company." *Cunningham*, 716 F.2d at 1458; *see* 29 U.S.C. § 1104(a)(2) (exempting ESOPs from diversification requirements); 29 U.S.C. § 1107(b), (d) (same); *see also Moench v. Robertson*, 62 F.3d 553, 568 (3d Cir. 1995) ("ESOPs, unlike pension plans, are not intended to guarantee retirement benefits, and indeed, by its very nature, 'an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan.'" (quoting *Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992)). If Matassarin were an ordinary ESOP participant, the nature of the Plan would probably exempt her account from standard ERISA diversification requirements. But Matassarin is of course not an ordinary ESOP participant, insofar as her account, per the terms of her QDRO, no longer depends upon employer securities. As such, any ESOP exception seems inapplicable.

the retirement benefits of his Great Empire ESOP shares. Presumably, she and Jenkins expected that the shares' value would increase in the years before Jenkins became eligible for retirement. Because the QDRO requires valuation of Matassarin's shares as of the date of her divorce, she lost the prospect of significant increase in the shares' value to fund her retirement. In short, Matassarin's QDRO removed her savings from the ambit of a more traditional ERISA-qualified ESOP or pension plan, which would focus on increasing savings.

This case raises the question, then, of how a plan administrator is to treat a beneficiary whose QDRO appears out of line from the greater goals of ERISA. We believe that both ERISA and case law require a plan administrator to follow the dictates of the QDRO. Once a plan administrator determines that a domestic relations order meets the criteria set forth in 29 U.S.C. § 1056(d)(3) and thus is "qualified," he is required to act in accordance with the QDRO. *See, e.g.*, *In re Gendreau*, 122 F.3d 815, 817-18 (9th Cir. 1997); *Metropolitan Life Insurance Co. v. Wheaton*, 42 F.3d 1080, 1085 (7th Cir. 1994). "ERISA does not require, or even permit, a pension fund to look beneath the surface of the order. Compliance with a QDRO is obligatory. . . . This directive would be empty if pension plans could add to the statutory list of requirements for 'qualified' status." *Blue v. UAL Corp.*, 160 F.3d 383, 385 (7th Cir. 1998). Through its QDRO

amendments, federal ERISA law defers to domestic relations orders approved in state court proceedings. We do not find the deference to be affected by whether the QDRO may slow the growth of the subject retirement savings.

Matassarin makes several arguments as to why her QDRO should not be enforced. She contends, for example, that Jenkins insisted on the QDRO format as necessary to recognition under the Great Empire ESOP, that Menke & Associates unfairly drafted the order, and that she did not realize the implications of the order for her retirement benefits. A United States district court is not the proper forum in which to raise such arguments. We acknowledge that ERISA supersedes state law insofar as the state law "relate[s] to" an ERISA-qualified employee benefit plan. 29 U.S.C. § 1144(a). Federal courts may be called upon to determine the proper beneficiary under a QDRO or to review a plan administrator's interpretation of a QDRO, as we have done here. But although we read § 1144(a)'s "relates to" language broadly, *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97, 103 S. Ct. 2890, 2900 (1983), we cannot say that a federal court's role extends as far as examining the circumstances under which a potential beneficiary entered and a state court approved a QDRO. Such a claim affects domestic relations, which is not an area of exclusive federal concern. *See Memorial Hospital System v. Northbrook Life Insurance Co.*, 904 F.2d 236, 245 (5th Cir. 1990)

-36-

(stating that cases in which ERISA preempts state-law claims, the claims address areas of exclusive federal concern). If Matassarin believes that she mistakenly entered the QDRO or was fraudulently induced to do so, then the Kansas state court that approved that order is the entity to hear her complaints. *Cf. Perkins v. Time Insurance Co.*, 898 F.2d 470, 473 (5th Cir. 1990) (holding that a claim that an insurance agent fraudulently induced an insured to surrender his current insurance and participate in an ERISA plan "related to" the ERISA plan only indirectly, so that ERISA would not preempt the state claim). The REA amendments preserve ERISA anti-alienation provisions while leaving domestic relations in the states' hands. We will not disturb that structure.

      c.    *Interference with Protected Rights*

ERISA § 510, titled "Interference with Protected Rights," makes it unlawful to discriminate against an ERISA plan beneficiary for exercising his rights or in order to interfere with his attainment of any right. *See* 29 U.S.C. § 1140. A violation of § 510 requires specific intent to discriminate. *See Unida v. Levi Strauss & Co.*, 986 F.2d 970, 979-80 (5th Cir. 1993). Matassarin alleges that Lynch, Oatman, Jenkins, and Great Empire discriminated against her for seeking her entitlement under her QDRO. Although her claims are not entirely clear, Matassarin apparently argues that because Great Empire sent her the May 1995 letters--which it claims were sent in error--and

later denied that she was entitled to any distribution, Great Empire was in fact discriminating against her for seeking what she was due. We find that summary judgment on this claim was appropriate because Matassarin produced no evidence that her inquiries prompted the defendants' actions or Plan interpretation. Matassarin also claims more general discrimination based on the appellees' contention that she was the only segregated account holder who was not entitled to a distribution in May 1995. This claim is likewise without merit. Unlike the sixty-seven separated Plan participants, Matassarin had a QDRO, a separate contract that required different treatment for Matassarin than for the sixty-seven holders of § 14(h) accounts offered distributions. Summary judgment was appropriate as to Matassarin's claims for interference with her protected rights.

      d.   *Failure To Provide Information*

Matassarin argues that the defendants violated ERISA § 105(a), 29 U.S.C. § 1025(a), which concerns statements furnished by an administrator to participants and beneficiaries:

> Each administrator of an employee pension benefit plan shall furnish to any plan participant or beneficiary who so requests in writing, a statement indicating, on the basis of the latest available information--(1) the total benefits accrued, and (2)

> the nonforfeitable pension benefits, if any, which have
> accrued, or the earliest date on which benefits will
> become nonforfeitable.

29 U.S.C. § 1025(a). As the provision states, the plan participant must request the statement in writing in order to trigger the administrator's § 1025 duty. Matassarin seeks penalties of $100 per day under ERISA § 502(c)(1) against the trustees and other fiduciary defendants for Great Empire's alleged failure to provide information regarding the value of her stock. Section 502(c)(1), similar to § 1025(a), requires the participant to request information before an administrator may be sanctioned for failing to provide it.[21] Matassarin does not state what, if any, material she specifically *requested* and the defendants failed to provide, such as would allow for penalties under § 502(c)(1). This Court reviews only for abuse of discretion a district court's decision whether to assess

---

21.  ERISA § 502(c)(1) states, in part:
    Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.
29 U.S.C. § 1132(c)(1).

penalties under § 502(c)(1). *See, e.g.*, *Godwin v. Sun Life Assurance Co.*, 980 F.2d 323, 327 (5th Cir. 1992) (reviewing only for abuse of discretion the district court's refusal to award penalties under § 502); *Fisher v. Metropolitan Life Insurance Co.*, 895 F.2d 1073, 1077 (5th Cir. 1990) (same). Given that the defendants do not appear to have denied any request that Matassarin made, the district court did not abuse its discretion in refusing to asses penalties.

In her Third Amended Complaint and other pleadings, Matassarin argued that the defendants violated ERISA when they failed to provide her with a summary plan description or with annual reports. She also provided the district court with an affidavit stating that she had not received a summary plan description. We need not examine whether the district court improperly granted summary judgment on this issue,[22] insofar as Matassarin fails to brief adequately or otherwise pursue it on appeal and thus has waived it.

Accordingly, we affirm the grant of summary judgment as to Matassarin's ERISA § 502(a)(3) claim.

C. *Jury Trial Demand*

Because we have concluded that Matassarin did not present any viable ERISA claim, we do not consider the district court's

---

22. ERISA § 104(b), 29 U.S.C. § 1024(b), requires that plan participants and beneficiaries be furnished with a summary plan description, as set forth in § 1022(a), and with annual reports.

denial of her motion for a jury trial.

D.  *Attorneys' Fees*

ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), allows the court, in its discretion, to award reasonable attorneys' fees to either party. Given that Matassarin herself performed most of the legal work and pursued unviable claims, the district court did not abuse its discretion in refusing to award attorneys' fees to Matassarin.

V

Matassarin next appeals Judge Prado's refusal to recuse himself. In her earlier petition to this Court for a mandamus directing the judge to recuse himself, Matassarin complained that a footnote in one of the judge's orders evinced a bias against her. She stated that the footnote, which reminded all parties to the action to treat court personnel with courtesy and civility, resulted from a briefing attorney incorrectly reporting to Judge Prado the tenor of a conversation he had with Matassarin. On the basis of this alleged bias, Matassarin claims, Judge Prado should have recused himself. *See* 28 U.S.C. §§ 144 and 455(a)-(b).

We review Judge Prado's denial of the motion to recuse for abuse of discretion. *See In re Billedeaux*, 972 F.2d 104, 106 (5th Cir. 1992) (citing *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982)). "The standard for judicial disqualification under 28 U.S.C. § 455 is whether a reasonable

person, with full knowledge of all the circumstances, would harbor doubts about the judge's impartiality." *Vieux Carre Property Owners, Residents, and Associates, Inc. v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991). We note that

> remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. . . . *Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune.

*Liteky v. United States*, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994); *see also Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 216 n.6 (5th Cir. 1998). Judge Prado's footnote, even if it did result from a false report about Matassarin's interaction with court personnel, falls far, far short of "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157. We therefore hold that the district court did not abuse its discretion in denying

the motion to recuse.

VI

The judgment of the district court is AFFIRMED in all respects.

-43-