AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES; Daniel W. O'Connor; Kent Bell; and Beth Bowen, Plaintiffs, on behalf of themselves and others similarly situated,

v.

Glenda E. HOOD, as Secretary of State for the State of Florida; Edward C. Kast, as Director, Division of Elections; John Stafford, as Supervisor of Elections in Duval County, Florida, Defendants.

No. 3:01cv1275–J–Alley/HTS.

United States District Court,
M.D. Florida,
Jacksonville Division.

Aug. 19, 2003.

James Douglas Baldridge, Alan M. Wiseman, Danielle R. Oddo, Courtney O. Taylor, Vincent E. Verrocchio, Ari N. Rothman, Howrey, Simon, Arnold & White, LLP, Lois G. Williams, Washington Laywers Committee for Civil Rights & Urban Affairs, Washington, DC, for plaintiffs.

Tracey I. Arpen, Jr., Ernst D. Mueller, Jason R. Teal, General Counsel's Office, Scott D. Makar, Office of General Counsel, Jacksonville, FL, Charles A. Finkel, Attorney General's Office, Tallahassee, FL, for defendants.

## ORDER

ALLEY, District Judge.

The following motions are presently before the Court for decision:

- Defendant Stafford's Motion to Dismiss Amended Complaint or, Alternatively, for Summary Judgment (Dkt. 53), Defendants Hood and Kast's Dispositive Motion to Dismiss Plaintiffs' Second Amended Complaint or in the Alternative Motion for Summary Judgment (Dkt. 55), Plaintiffs' Consolidated Response (Dkt. 59) in opposition thereto, Plaintiffs Supplemental Memorandum (Dkt. 110) in opposition thereto, Defendant Stafford's Response to Plaintiffs' Supplemental Memorandum (Dkt. 112), and Defendants Hood and Kast's Response to Plaintiffs' Supplemental Memorandum (Dkt. 111);

- Plaintiffs' Motion for Summary Judgment Against Defendant John Stafford on Count I (ADA) of the Amended Complaint (Dkt. 95), and Defendant Stafford's Response (Dkt. 100) in opposition thereto;

- Plaintiffs' Motion for Leave to File a Reply Memorandum to Correct Materially False Allegations in the County's Opposition to Plaintiffs' Summary Judgment Motion (Dkt. 105), and Defendant Stafford's Response (Dkt. 107) in opposition thereto.

## I. Facts and Background Information

Plaintiffs Daniel O'Connor and Beth Bowen are visually impaired persons registered to vote in Duval County. Plaintiff Kent Bell is a manually impaired person registered to vote in Duval County. The individual Plaintiffs are unable to vote without third-party assistance using the optical scan voting system Duval County purchased in 2002. O'Connor has voted in Duval County in most elections since 1992, either with his wife's assistance or with the assistance of poll workers. *See* Dkt. 77, O'Connor's Deposition, p. 34–36. Bell has voted in Duval County in three elections since 2001, each time with third-party assistance. *See* Dkt. 79, Bell's Deposition, p.

8–9. Bowen has voted in most Duval County elections since 1962, each time with third-party assistance. *See* Dkt. 78, Bowen's Deposition, p. 13–14.

All three individual Plaintiffs have expressed concerns about voting with third-party assistance. O'Connor has wondered whether his vote has been accurately cast according to his wishes. *See* Dkt. 77, p. 16–17. In addition, O'Connor stated that he cannot be sure that the person providing assistance will read the entire ballot to him. *See id.* at 20. O'Connor testified that on one occasion the person providing assistance did not initially read the candidates' party affiliations, although she did so upon his request. *See id.* at 20–21. O'Connor also testified about being provided assistance in a room where other disabled voters were being provided assistance and how he could overhear other disabled voters' selections. *See id.* at 37–38. Finally, O'Connor is concerned with the possibility that the people who provide him assistance will reveal his vote to others. *See id.* at 56.

Bell stated that having to vote with assistance causes him to feel like "a second-class citizen" and that he is concerned that others may hear him when he tells the person providing assistance for whom he wishes to cast his vote. *See* Dkt. 79, p. 10–11. During one election, Bell had to wait five minutes before someone was available to assist him, during which time other voters were able to cast their votes. *See id.* at 33–34.

Plaintiff Bowen expressed concern that her ballots have not been marked according to her wishes, although she stated that she did not have a concrete basis for this belief. *See* Dkt. 78, p. 31–33. Bowen testified that she has had to ask what candidates' party affiliations are or who the candidates are for a position, but the information has always been provided. *See id.*

at 36–38. In addition, Bowen stated that she has had to make her vote more public by telling the person providing assistance her choice of candidates in a way that permits others to overhear her vote. *See id.* at 39–40.

Defendant Glenda Hood is the Florida Secretary of State. As head of the Department of State, she has overall responsibility for the administration of the state's election laws and for the supervision of Defendant Edward Kast, Director of the Division of Elections. Kast is the person within the Department responsible for election matters, including the approval of voting systems. Defendant John Stafford is the Supervisor of Elections for Duval County, Florida, and is responsible for selecting and purchasing voting systems for use within the county.

In Florida, a voting system must be certified by the Division of Elections of the Florida Department of State before a county may purchase the system. *See* Fla. Stat. § 101.294(1). The Certification process begins when a voting system is presented to the Bureau of Voting Systems Certification by the filing of a Division of Elections application form entitled "Application for Certification or Provisional Certification of Voting System." [1] *See* Dkt. 82, Paul Craft's Deposition, p. 87, Exhibit 7, p. 8. A voting system must meet the requirements set forth in the Florida Election Code and the Florida Voting System Standards. *See id.* at 77.

The Department of State has certified a number of voting systems that contain at least some components that make unassisted voting available to some disabled voters. Former Florida Secretary of State Katherine Harris sent a memorandum dated September 18, 2001, to all county Supervisors of Elections in which she stated that, as of the writing of the letter, a voting system containing an audio ballot interface had been certified. *See* Dkt. 69, John Stafford's Deposition, p. 89, Exhibit 11. Paul Craft, the Chief of the Bureau of Voting Systems Certification, stated that he believed that an Elections Systems and Software, Inc. (ES & S), voting system with touch screens and an audio ballot was certified in the first half of 2001. *See* Dkt. 82, p. 131. In addition, the following voting systems were certified by the Florida Department of State and include an audio ballot:

- The ES & S Voting System, Release 3, certified May 7, 2002. *See* Dkt. 69, p. 93, Exhibit 12.
- The ES & S Voting System, Revised Release 3.1, certified June 17, 2002. *See* Dkt. 82, p. 123, Exhibit 13.
- The ES & S Voting System, Release 4, certified August 7, 2002. *See id.* at 124, Exhibit 14.
- The Sequoia Voting Systems, Inc. (Sequoia), AVC Edge Voting System, Release Level 3, certified August 7, 2002. *See id.* at 127, Exhibit 17.
- The ES & S Voting System, Release 3.2, certified August 21, 2002. *See id.* at 126, Exhibit 16.
- The ES & S Voting System, Release 4.2, certified August 21, 2002. *See id.* at 125, Exhibit 15.
- The Sequoia AVC Edge Voting System, Release Level 3.1, certified October 31, 2002. *See id.* at 143, Exhibit 19.

Finally, a Hart InterCivic voting system was presented to the Division of Elections for certification but was not certified. *See id.* at 148–49. Craft stated that the Division of Elections did not certify the Hart InterCivic system presented because it failed the Division's testing. *See id.*

---

1. The Bureau of Voting Systems Certification is part of the Division of Elections.

Craft stated that several anomalies occurred that were never successfully resolved. *See id.* at 149.

At least one voting system manufactured by Hart InterCivic, the eSlate Electronic Voting System, allows visually impaired voters to vote without assistance via audio components and allows manually impaired voters to vote without assistance via "jelly switch" or "sip and puff" devices.[2] *See* Dkt. 93, p. 33, 39, 43–50. Craft stated, however, that the Hart InterCivic system presented to the Florida Department of State for certification did not contain sip and puff stick components. *See* Dkt. 82, p. 148. It is not clear whether the Hart InterCivic system presented for certification contained jelly bean switch components. According to Stafford, no voting system certified in Florida includes puff technology. *See* Dkt. 69, p. 128.

The Division of Elections provides technical advice to the county Supervisors of Elections, including technical assistance concerning how voting systems differ and what types of things counties should consider when selecting a voting system. These include the number of registered voters, structure and resources available for storing voting systems, available staff support, costs, preparation, maintenance, and storage costs. *See* Dkt. 82, p. 47–48. Craft testified that the Division of Elections does not make specific recommendations as to which system a county should purchase or whether one system is better than another. *See id.* at 49–50.

Duval County had to replace its previous punch card voting system before the Sep-tember 2002 elections following the enactment of legislation prohibiting the use of such systems after September 1, 2002. *See* Dkt. 69, p. 132; *see also* 2001 Fla. Laws ch.2001–40, § 18. Stafford stated that he decided to purchase the Global Election Systems AccuVote voting system in January 2002. *See* Dkt. 69, p. 130; Dkt. 90, Jacquelyn Gibb's Deposition, Exhibit 2, Exhibit A. In January or February of 2002, the Jacksonville City Council approved and appropriated money for the purchase. *See* Dkt. 69, p. 130; Dkt. 90, p. 18, 21, Exhibit 2. Subsequently, the Jacksonville Procurement and Supply Division approved the procurement and recommended the purchase of the AccuVote voting system. *See* Dkt. 90, Exhibit 2, Exhibit C. On October 3, 2002, the City of Jacksonville signed an agreement with Diebold Election Systems, Inc. (Diebold),[3] to lease the AccuVote optical scan voting system with the option to purchase the system for a nominal amount at the end of the lease period. *See* Dkt. 69, p. 59.

In addition, the City purchased three Diebold touch screen machines, which have audio auxiliary accessibility components. *See id.* at 20, 56; Dkt. 90, Exhibit 4, Exhibit A. Stafford asserts that Diebold agreed to get the touch screen machines certified as part of a certified voting system in time for the 2002 elections but that Diebold failed to do so. *See* Dkt. 69, p. 97–98. Stafford testified during his February 11, 2003, deposition that he intended to locate the three touch screen machines at election headquarters in downtown Jacksonville for visually impaired voters to use

---

**2.** A "sip and puff" device is a device that allows severely physically impaired voters to cast their ballots using only their breath. A "jelly switch" or "jelly bean switch" is a round switch, roughly two-inches in diameter, that allows physically impaired voters to cast their ballots by activating the switch with a hand, finger, pencil, or other body part or instrument; minimal force is required to activate a jelly switch because the switch is sensitive to a small amount of pressure.

**3.** Diebold Election Systems, Inc., purchased Global Election Systems in February or March 2002. *See* Dkt. 69, p. 97.

if they chose. *See id.* at 60. Also, the City's agreement with Diebold permits the City to trade in the optical scan machines by December 31, 2007, in exchange for credit toward the purchase of touch screen machines. *See* Dkt. 90, Exhibit 4, ¶ 4.10.

Stafford asserts that he made the purchase decision in January or February 2002 to ensure that the new voting system would be in place in time for the September 2002 elections. *See* Dkt. 69, p. 132. Stafford stated that he was told that it would take three to four months to receive the equipment once purchased. *See id.* at 133. Stafford received a few machines for training in April 2002 with the rest of the 315 machines arriving in May and June. *See id.*

Stafford stated that he selected the Diebold optical scan system because he believed it was the most accurate certified system with a proven track record. *See* Dkt. 69, p. 96–97. Stafford stated that they considered an ES & S system but opted not to purchase the ES & S system because (1) the ES & S system contained a voter override feature that he did not like; (2) Diebold agreed to have the touch screen machines certified; and (3) the ES & S system took longer to "boot-up" than the Diebold optical scan system. *See* Dkt. 69, p. 96–97.

The Division of Elections has not certified the Diebold touch screen machines supporting audio ballots. *See* Dkt. 82, p. 150–51. The machines were not certified, at least in part, because a blind voter testing the machines could not successfully navigate through the audio ballot. *See id.* at 151. It is not clear whether Diebold subsequently withdrew its application for certification or if it just failed to continue to pursue certification. *See id.* at 150. According to Craft, a Diebold representative told him in or around the beginning of 2003 that Diebold was not willing to pursue certification until the next version of the Voting System Standards were issued. *See id.* at 152.

The Department of State includes, *inter alia,* the Division of Elections, the Division of Historical Resources, the Division of Cultural Affairs, and the Division of Library Information Services. *See* Dkt. 74, Hal Lench's Deposition, p. 11; Dkt. 75, Clayton Roberts' Deposition, p. 17. Hal Lench, the Director of Administrative Services for the Florida Department of State, stated that the Divisions of Historical Resources, Cultural Affairs, and Library Information Services receive federal funds. *See* Dkt. 74, p. 11. According to Hal Lench, the Division of Elections does not receive federal funding for election related programs. *See id.* at 21.

## II. Plaintiffs' Claims

On November 5, 2002, Plaintiffs filed their Amended Complaint (Dkt. 47), alleging that Defendants violated Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131–12165(ADA), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Specifically, Plaintiffs allege (1) that, by certifying and purchasing voting equipment that is not accessible to visually and manually impaired voters, Defendants discriminated against Plaintiffs in violation of 42 U.S.C. § 12132 by not affording them the opportunity to vote in the same or similar manner as non-disabled voters; (2) that Defendants violated 28 C.F.R. § 35.151(a)-(b) by failing to ensure that the new voting system is readily accessible to and usable by Plaintiffs; (3) that Defendants violated 28 C.F.R. § 35.160 by failing to take appropriate steps to ensure that Plaintiffs are able to communicate their votes as effectively as non-disabled voters, by failing to furnish appropriate auxiliary aids that afford Plaintiffs an equal opportunity to participate in and enjoy the benefits of independently voting by secret ballot, and by failing to give primary consideration to Plaintiffs' requested

auxiliary aids; and (4) that, by certifying and purchasing voting machines that do not permit visually and manually impaired voters to vote without assistance, Defendants violated 29 U.S.C. § 794 and 28 C.F.R. § 42.503. Plaintiffs allege that the Defendants' discrimination manifests itself by the Plaintiffs' (a) being forced to reveal their votes to third-parties; (b) risking and having their votes further revealed to others; (c) risking and having their votes influenced by third-parties; (d) having to vote in a manner that singles them out at the polls; (e) having to wait long periods until a third-party is available to provide assistance; (f) having to incur the burden of traveling to Elections Headquarters to use the three audio-ballot accessible voting machines purchased by Duval County; and (g) having to suffer embarrassment and distress when voting for the foregoing reasons and because they have to vote in a manner materially different from and more burdensome than the manner in which non-disabled voters vote.

## III. Defendants' Motions

Defendants' Motions seek summary judgment as an alternative to dismissal. In view of the voluminous record that has been generated since the filing of the Motions, they will be treated as motions for summary judgment and disposed of as provided in Rule 56. *See* Fed.R.Civ.P. Rule 12(b). All parties have received ample opportunity to present materials made pertinent by Rule 56 and to be heard on all issues presented by the Motions. In fact, based on the record developed after Defendants' Motions were filed, Plaintiffs seek summary disposition in their favor of the ADA claim against Defendant Stafford.

## IV. Summary Judgment Standard

Summary judgment is appropriate only when a court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). In making this determination, a court must view all the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of establishing the absence of a genuine issue is on the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the burden extends only to facts that might affect the outcome of the suit under the governing law. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once this burden is met, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, a non-movant need only present evidence from which the trier of fact might return a verdict in his favor in order to survive a summary judgment motion. *See Anderson*, 477 U.S. at 254, 106 S.Ct. 2505.

## V. Summary of Contentions

The core contention of Plaintiffs is this: Even if access to third party assistants to help visually and manually impaired voters satisfied legal requirements in the past, when new equipment was recently purchased, the law required the selection of equipment that would permit these voters to use it unassisted by third parties. Defendants raise numerous legal challenges to Plaintiffs' claims. Nonetheless, for reasons explained below, the Court finds that genuine disputes of material facts preclude entry of summary judgment for any party.

## VI. Analysis

As a threshold matter, the Court finds that Plaintiffs have standing to assert their claims because the ADA, the Rehabilitation Act, and the implementing regulations

create legal rights that allegedly have been violated and likely will be violated when Plaintiffs next have opportunity to vote. All three individual Plaintiffs are registered to vote in Duval County, have consistently voted in Duval County since becoming residents, and intend to vote in future elections. Thus, the alleged violations of their rights will occur again. In addition, Plaintiffs assert that their injuries are traceable to the conduct of Defendants Hood and Kast (State Defendants) because the State Defendants have failed to certify voting systems that would allow them to vote without assistance. In short, Plaintiffs have made a sufficient showing to demonstrate the existence of an actual case or controversy for adjudication, as required by Article III of the Constitution.

A second preliminary matter is the effect of the Order of October 16, 2002. By that Order, the Court dismissed with prejudice Plaintiffs' ADA and Rehabilitation Act claims to the extent they were based on Plaintiffs' having been excluded from or denied the benefits of a program of direct and secret voting without the third-party assistance that is authorized by Section 101.051, Florida Statutes. *See* Dkt. 42, pp. 37–38. The Order did not foreclose, however, the assertion of other claims based on the recent purchase of new voting equipment. By their Amended Complaint, Plaintiffs assert, among other things, that Defendants violated the ADA and related regulations by certifying and purchasing voting equipment that is not readily accessible, that does not meet the requirements regarding communications and auxiliary aids, and that prevents Plaintiffs from voting in the same or similar manner as other voters. The Court finds that the Amended Complaint states claims that are not identical to those previously dismissed and that

Plaintiffs' claims are not precluded by the October 16 Order.

■ Plaintiffs' claims implicate the ADA, the Rehabilitation Act, and the implementing regulations promulgated under these statutes. Title II of the ADA provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides in pertinent part:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). Under both laws, Congress mandated the promulgation of implementing regulations that would be consistent with each other. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12134(a)-(b). The regulations most pertinent to this case set standards for accessibility and communications.[4] Section 35.151 of Title 28 of the Code of Federal Regulations provides:

(a) *Design and construction.* Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is *readily accessible to and usable by* individuals with disabilities, if the construction was commenced after January 26, 1992.

---

4. While the following discussion utilizes regulations issued under the ADA, regulations implementing the Rehabilitation Act contain similar standards. *See* 28 C.F.R. §§ 39.151, 39.160.

(b) *Alteration.* Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, *to the maximum extent feasible,* be altered in such manner that the altered portion of the facility is *readily accessible to and usable by* individuals with disabilities, if the alteration was commenced after January 26, 1992.

28 C.F.R. § 35.151(a)-(b) (emphasis added).[5] Section 35.160 of Title 28 of the Code of Federal Regulations provides:

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160.[6] Other regulations issued under the ADA and the Rehabilitation Act identify generally prohibited acts. *See* 28 C.F.R. §§ 35.130, 42.503. Among other things, these regulations provide:

A public entity, in providing any aid, benefit, or service, may not, . . . on the basis of disability—

\* \* \* \* \* \*

(iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.

28 C.F.R. § 35.130(b)(1)(iii); *see also* 28 C.F.R. § 42.503(b)(1)(ii).

Unless there is some impediment to their cases, Plaintiffs have demonstrated genuine issues of material facts as to whether these standards were violated when Defendants certified and purchased new voting equipment. Issues presented for trial include: (1) whether the equipment is, to the maximum extent feasible, readily accessible and useable by visually and manually impaired persons; (2) whether communications with visually and manually impaired voters are as effective as communications with other voters; and (3) whether the auxiliary aid provided-i.e., third-party assistance-affords visually and manually impaired voters an equal opportunity to participate in or gain the benefits of the activity of voting. The Court does not intend this enumeration of issues to constitute an exhaustive list of matters to be decided at trial.[7]

■ The Court turns now to Defendants' asserted impediments to Plaintiffs'

---

5. Because voting equipment plainly falls within the expansive definition of "facility" contained in the regulations, *see* 28 C.F.R. § 35.104, these standards apply to a purchase of new voting equipment in 2002. The Court agrees with Plaintiffs that the standard for alterations, rather than new construction, is applicable here. Unlike Plaintiffs, however, the Court views the "to the maximum extent feasible" as a limitation rather than expansion of the standard.

6. The phrase "auxiliary aids and services" is defined in a way that would include third-party assistants for voting, *see* 28 C.F.R. § 35.104, but the items listed in the regulation "is not an all-inclusive or exhaustive catalogue of [all those] possible or available." 28 C.F.R. Pt. 35, App. A.

7. The regulatory scheme provides a possible defense to compliance with these standards, which defense (if raised) may present additional factual issues. Section 35.164 of Title

claims. The State Defendants contend that they have no cognizance over ADA compliance issues. The State Defendants rely on a state statute defining the scope of their authority to argue that they have no duty to ensure that local election officials' comply with the ADA. *See* Fla. Stat. § 15.13. Clearly, however, voting is one area that Congress intended the ADA to affect. *See* 42 U.S.C. § 12101(a)(3) (stating a congressional finding that discrimination against individuals with disabilities persists in the area of voting). Title II of the ADA is a law of general application applying to all public programs, activities, and services. *See Lightbourn v. County of El Paso,* 118 F.3d 421, 430 (5th Cir.1997). Thus, regardless of any legal duties imposed by Florida law, the Court finds that Defendants must conform their conduct to satisfy federal requirements of the ADA.

As to the State Defendants, the record demonstrates that their involvement in the purchase of voting equipment occurs only in the certification of equipment for use within the state. *See* Fla. Stat. § 101.294(1). If the State Defendants

wrongfully refused to certify accessible equipment, then they may have violated the ADA; otherwise they have no liability on Plaintiff's claims. *See Lightbourn,* 118 F.3d at 431.

The facts currently of record indicate that the Florida Department of State has certified equipment that would allow visually impaired voters to vote without assistance. It is unclear from the record, however, whether the Department of State has certified voting equipment that would allow manually impaired voters to vote without assistance. Also, there is sufficient evidence to create a genuine issue of fact as to whether such a system was presented for certification. There is evidence that a Hart InterCivic System was presented for certification but was rejected. It is unclear whether this system included technology that would allow manually impaired voters to vote without assistance. To the extent that such technology was included and that certification was wrongfully rejected, the State Defendants may have violated the ADA and the Rehabilitation Act.[8] Thus, the State Defendants' Motion

28 of the Code of Federal Regulations provides:

> This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for

> reaching that conclusion. If an action required to comply with this subpart would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity.

8. The Court rejects the State Defendants' contention that they are not subject to the Rehabilitation Act because the Department of State does not receive federal funding for any election-related activities. The plain language of the statute and its legislative history indicate that if any part of a state department receives federal financial assistance, then the entire department is covered. *See* 29 U.S.C. § 794(b); *see also Lussier v. Dugger,* 904 F.2d 661, 665 (11th Cir.1990). The undisputed facts of record in this case demonstrate that

for Summary Judgment will be granted except to the extent that Plaintiffs allege that the State Defendants violated the ADA and the Rehabilitation Act by wrongfully failing to certify a voting system that would permit manually impaired voters to vote without assistance.

■ Turning to Defendants' arguments based on compliance with the Voting Rights Act (VRA) and the Voting Accessibility for the Elderly and Handicapped Act (VAEH), the latter was enacted in 1984 to "promote the fundamental right to vote by improving access for handicapped and elderly individuals to registration facilities and polling places for Federal elections." 42 U.S.C. § 1973ee. Section 1973ee–1(a) provides:

**Accessibility to all polling places as responsibility of each political subdivision**

Within each State, except as provided in subsection (b) of this section, each political subdivision responsible for conducting elections shall assure that all polling places for Federal elections are accessible to handicapped and elderly voters.

The Senate Report accompanying the VAEH provides:

The bill could have a marginal effect on the privacy of those individuals who request an absentee ballot, or who request reassignment to an accessible polling site, on the grounds of a temporary or permanent physical disability, as provided by the bill. The broader aim of the legislation is to insure that those persons with disabilities are afforded the same rights and opportunities as other citizens in registering and voting in federal elections. Thus the committee anticipates that any minimal effect on the privacy of those who are elderly or handicapped is more than offset by the expanded opportunities for participation in the political process.

S. REP. No. 98–590, at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2801, 2807. While the legislative history of the VAEH thus indicates Congress' willingness to accept a minimal effect on privacy of disabled voters in exchange for expanded voting opportunities, the VAEH would not appear to prevent Plaintiffs' claims as to voting machines.

The pertinent provision of the VRA was added in 1982. It provides:

Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union.

42 U.S.C. § 1973aa–6. The Senate Report concerning this provision indicates that, "because of their need for assistance," disabled voters were more susceptible "to having their vote unduly influenced or manipulated." S. REP. No. 97–417, at 62 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 240. Finding that "the manner of assistance has a significant effect on the free exercise of the right to vote," the Senate Committee concluded that, "to limit the risks of discrimination against [disabled voters] and avoid denial or infringement of their right to vote[,] . . . [disabled voters] must be permitted to have the assistance of a person of their own choice." S. REP. No. 97–417, at 62 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 240–41.

To the extent Plaintiffs' claims are based on alleged violations of specific regulations, compliance with the VRA would not absolve Defendants from complying with the

parts of the Florida Department of State have receive federal financial assistance, thus

obliging the whole department to comply with Section 504 of the Rehabilitation Act.

requirements set forth in those regulations. The regulations clearly require, for example, that altered or newly constructed facilities be constructed so that they are readily accessible to and usable by disabled persons. *See* 28 C.F.R. § 35.151. Similarly, the regulations require that a public entity ensure that communication is as effective with disabled persons as with others and that public entities provide auxiliary aids to disabled persons that afford them an equal opportunity to participate in and enjoy the benefits of the program. *See* 28 C.F.R. § 35.160. Thus, while the ADA and the Rehabilitation Act do not necessarily create a comprehensive federal right to vote without assistance, the application of the ADA and the Rehabilitation Act in a particular case may have the effect of requiring equipment that allows voters to vote without assistance.

The language of Title II of the ADA does not alter this conclusion. As stated earlier, Congress clearly intended the ADA to affect voting. *See* 42 U.S.C. § 12101(a)(3). In addition, Section 12201(b) sets forth Title II's relationship with other laws. It provides in pertinent part:

> Nothing in [the ADA] shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by [the ADA].

*See* 42 U.S.C. § 12201(b). The application of the ADA in the manner sought by Plaintiffs would not limit or invalidate the rights

provided under the VRA or the VAEH. Instead, in the context of this case, the application of the ADA sought by Plaintiffs would provide broader rights or remedies than provided by the VRA or the VAEH.

Similarly, the application of the ADA sought by Plaintiffs would not displace the VRA. The VRA provides disabled voters who require assistance the right to have a person of their choice assist them (subject to exceptions). Section 101.051 of the Florida Statutes goes even further and provides visually and manually impaired voters the right to receive assistance from two poll workers. If Plaintiffs' claims are successful, the third-party assistance authorized by the VRA and Section 101.051 will continue to be available. However, Defendants' compliance with these statutes does not necessarily mean that Defendants have complied with the specific requirements of the ADA.[9]

 The final impediment asserted by Defendants is a Letter of Finding issued August 25, 1993, by the Civil Rights Division of the United States Department of Justice. Stafford contends that the Letter conclusively refutes the existence of any federal right to vote without assistance. The Letter was written in response to a complaint against the Pinellas County Supervisor of Elections. *See* Dkt. 58, Exhibit 1, p. 1. The complaint alleged that the Pinellas County Supervisor of Elections violated Title II of the ADA by failing to provide Braille ballots or an electronic voting system to blind voters so that they could vote without assistance. *See id.* The Civil Rights Division (Division) held that

---

9. Defendants also assert that the Help America Vote Act (HAVA) addresses Plaintiffs' concerns and that HAVA provides exclusive federal accessibility standards related to voting. It does appear that the HAVA addresses some of Plaintiff's concerns. *See, e.g.,* 42 U.S.C. § 15481 (setting standards for voting systems used in elections for federal office, including accessibility requirements for disabled voters). Nevertheless, HAVA makes clear that it is not to be construed as superseding or limiting the application of the ADA or the Rehabilitation Act. *See id.* § 15545(a). Also, HAVA does not mandate immediate compliance with its accessibility standards. *See id.* § 15481 (requiring compliance by January 1, 2006).

the Pinellas County Supervisor of Elections did not violate Title II of the ADA. *See id.* at 2. The Division's analysis was limited to whether the Pinellas County Supervisor of Elections complied with 28 C.F.R. § 35.160. *See id.* at 1–2. The Division determined that, "[a]lthough providing assistance to blind voters does not allow the individual to vote without assistance, it is an effective means of enabling an individual with a vision impairment to cast a ballot." *Id.* at 2. The Division reasoned that the requirement of Section 35.160 that individuals with disabilities be provided equally effective communications "encompasses the concept of equivalent, as opposed to identical" and, thus, that the assistance provided to blind voters provided equally effective communications. *Id.*

Stafford's interpretation of the Letter is overly broad. The Letter only purports to evaluate whether the Pinellas County Supervisor of Elections provided equally effective communications to blind voters. Thus, to the extent that the Letter is relevant to this case, its relevance would appear limited to Plaintiffs' claims under 28 C.F.R. § 35.160. Also, while the Letter may have persuasive value as to this claim, it is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant *Chevron*-style deference"). Thus the Letter is not dispositive of Plaintiffs' claims.

Because none of the legal impediments raised by Defendants precludes Plaintiffs' claims, Defendants are not entitled to a judgment as a matter of law under Rule 56. On the other hand, due to the existence of factual issues, neither are Plaintiffs.

## VII. Motion for Leave to File Reply

Because the existing briefs are adequate to permit full consideration of the issues, Plaintiffs' Motion for Leave to File a Reply regarding Plaintiffs' Motion for Summary Judgment will be denied.

Upon consideration thereof, it is hereby **ORDERED:**

1. Defendant Stafford's Motion to Dismiss Amended Complaint or Alternatively for Summary Judgment (Dkt. 53) is **DENIED.**

2. Defendants Hood and Kast's Dispositive Motion to Dismiss Plaintiffs' Second Amended Complaint or in the Alternative Motion for Summary Judgment (Dkt. 55) is **DENIED** as to the issue of whether Hood and Kast wrongfully failed to certify voting systems that would permit manually impaired voters to vote without assistance. Otherwise the Motion (Dkt. 55) is **GRANTED.**

3. Plaintiffs' Motion for Summary Judgment Against Defendant Stafford on Count I(ADA) (Dkt. 95) is **DENIED.**

4. Plaintiffs' Motion for Leave to File a Reply Memorandum (Dkt. 105) is **DENIED.** The Clerk is **DIRECTED** to retain the proposed Reply in the file.